[Nos. A042774, A043950. First Dist., Div. One. Mar. 27, 1990.]

RICHARD SHADOAN et al., Plaintiffs and Appellants, v.
WORLD SAVINGS AND LOAN ASSOCIATION et al., Defendants
and Appellants.

**COUNSEL**

Spiegel, Liao & Kagay and Charles M. Kagay for Plaintiffs and Appellants.

Adams, Sadler & Hovis, Barry D. Hovis and Doniel E. Weil for Defendants and Appellants.

**OPINION**

**STEIN, J.**—Richard and Antje Shadoan (the Shadoans) paid the balance of an August 1980 loan obtained by them from World Savings and Loan Association (World). Pursuant to the loan agreement, the Shadoans on October 19, 1987, paid a $5,189.18 prepayment penalty to World. They then brought the instant action on behalf of themselves and others similarly

situated, alleging that the prepayment penalty provision was an unfair business practice, seeking to enjoin World from collecting prepayment penalties from other borrowers and seeking recovery of the prepayment penalty they paid.

The superior court granted World's demurrer to the complaint and dismissed the action. The superior court also awarded World a portion of its attorney fees, pursuant to an attorney fees provision in the loan agreement. The Shadoans appeal, and World cross-appeals insofar as the court's order awarding attorney fees limited the amount of fees awarded.

## THE APPEAL

### 1. Allegations of Unfair Business Practice and Unconscionability

The Shadoans' theory is that World committed an unfair business practice by including in its loan agreement both a prepayment penalty clause, and a clause permitting the lender to "unilaterally call" the loan—i.e., to demand full payment of the loan principal. Their theory rests on Business and Professions Code section 17200 et seq. and Civil Code section 1670.5.

Business and Professions Code section 17203 permits a court to "make such orders or judgments . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition . . . or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." "Unfair competition" is defined in Business and Professions Code section 17200 to include an unfair business practice.

Civil Code section 1670.5 provides that upon finding that a contract or any clause of a contract is unconscionable, a court "may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." ■ By its terms the statute presents a defense to an attempt to enforce such a contractual provision; those terms do not speak to a party who has fully performed a contract and seeks restitution, nor do they expressly grant the court the power to enjoin future action. (See *Dean Witter Reynolds, Inc.* v. *Superior Court* (1989) 211 Cal.App.3d 758, 766 [259 Cal.Rptr. 789].) However, that a contractual provision is unconscionable may be relevant to the question of

whether a party who drafted—and seeks to enforce—the provision, has committed an unfair business practice.

Civil Code section 1670.5 follows the law developed primarily in the sale of goods, governed by the Uniform Commercial Code,[1] in enabling courts to grant relief from unconscionable contracts or clauses. "The principle is one of the prevention of oppression and unfair surprise." (Legis. Com. comment to Civ. Code, § 1670.5.) ■ As stated by the court in the seminal case of *Williams* v. *Walker-Thomas Furniture Company* (D.C. Cir. 1965) 350 F.2d 445, 449, "Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party."

Absence of meaningful choice occurs when a party to a bargain has little choice but to accept the terms stated by the other party. It occurs, for example, if "the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms. [Citations.]" (*A & M Produce Co.* v. *FMC Corp.* (1982) 135 Cal.App.3d 473, 486 [186 Cal.Rptr. 114, 38 A.L.R.4th 1].)

It also can occur where a party is wholly unable to obtain the same consideration on other terms. The classic situation is discussed in *Henningsen* v. *Bloomfield Motors, Inc.* (1960) 32 N.J. 358 [161 A.2d 69, 87, 75 A.L.R.2d 1]: "[t]he warranty before us is a standardized form designed for mass use. It is imposed upon the automobile consumer. He takes it or leaves it, and he must take it to buy an automobile. No bargaining is engaged in with respect to it. In fact, the dealer through whom it comes to the buyer is without authority to alter it; his function is ministerial—simply to deliver it. The form warranty is not only standard with Chrysler but, as mentioned above, it is the uniform warranty of the Automobile Manufacturers Association. Members of the Association are: General Motors, Inc., Ford, Chrysler, Studebaker-Packard, American Motors, (Rambler), Willys Motors, Checker Motors Corp., and International Harvester Company. . . . Of these companies, the 'Big Three' (General Motors, Ford, and Chrysler) represented 93.5% of the passenger-car production for 1958 and the independents 6.5%)." Similarly, in *Graham* v. *Scissor-Tail, Inc.* (1981) 28 Cal.3d 807 [171 Cal.Rptr. 604, 623 P.2d 165], the court found an experienced promoter and producer of musical concerts—who ordinarily would

---

[1] Uniform Commercial Code section 2-302 sets forth the code's provision on unconscionability. That section was not adopted by California into the Commercial Code. Instead, the Legislature enacted Civil Code section 1670.5, which employs the same language as Uniform Commercial Code section 2-302, so that its provisions would be applicable to *all* contractual obligations. (Legis. Com. comment to Civ. Code, § 1670.5.)

be thought to have a great deal of bargaining power—lacked bargaining power because the musicians' union required him to sign their form contract with any concert artist with whom he wished to do business. (*Id.* at pp. 818-819.)

In the present case, however, the Shadoans alleged no facts indicating that they were unable to receive more favorable terms from another lender, or from World by paying a different interest rate, or by accepting a different type of loan or one with a different term.[2] Thus they alleged no facts from which it could be concluded that they lacked true bargaining power. Their allegations stated no more than those at issue in *Jacobs* v. *Citibank, N.A.* (1984) 61 N.Y.2d 869 [474 N.Y.S.2d 464, 462 N.E.2d 1182], cited by the court in *Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913, 927, fn. 12 [216 Cal.Rptr. 345, 702 P.2d 503]. Finding allegations that "similar arrangements would be imposed by other banks" withstood a demurrer, the *Perdue* court distinguished the situation presented in *Jacobs* v. *Citibank* where summary judgment was granted, in part, because " '[p]laintiffs have failed to show that they were deprived of a meaningful choice of banks with which they could do business. . . .' " (*Perdue, supra,* at p. 927, fn. 12.)

To allege that the contract was unconscionable states no more than a legal conclusion. Nor does the allegation that the agreement was an adhesion contract state facts demonstrating a lack of bargaining power. "To describe a contract as adhesive in character is not to indicate its legal effect. It is, rather, 'the beginning and not the end of the analysis insofar as enforceability of its terms is concerned.' [Citations.] Thus a contract of adhesion is fully enforceable according to its terms [citations] unless certain other factors are present which, under established legal rules—legislative or judicial—operate to render it otherwise." (*Graham* v. *Scissor-Tail, Inc., supra,* 28 Cal.3d at pp. 819-820; see also *Perdue* v. *Crocker National Bank, supra,* 38 Cal.3d at p. 925.)

In any event, we do not see that the loan provisions at issue are so oppressive or unreasonably favorable to World as to make them

---

[2] The relevant allegations in the Shadoans' complaint are, "Borrowers such as plaintiffs rely on banking institutions such as World for real estate financing. Borrowers such as plaintiffs have no bargaining power in obtaining real estate financing from banking institutions such as defendant. Plaintiffs and similar borrowers have no choice but to acquiesce to the unilateral call and prepayment penalty provisions when obtaining real estate financing from World. [¶] When defendant World's preprinted form prepayment penalty and unilateral call provision are both in effect during the term of a real estate loan, the loan agreement is a contract of adhesion that is unconscionable and unlawful . . . ."

unconscionable. By the terms of the loan agreement, the unilateral call provision was not effective until three years after the loan was issued. World could call the loan only upon six-months' notice. And, significantly, the prepayment penalty would not attach if early payment was made because the lender exercised its right to call the loan.

Unilateral call and prepayment penalty provisions are legislatively recognized and sanctioned. Civil Code section 2954.9 specifically authorizes prepayment penalties on "residential property of four units or less."[3]

The Shadoans correctly point out that these statutory provisions do not specifically authorize the use of both a unilateral call and a prepayment penalty provision in the same document. Legislative authorization is, however, implied from section 7504 which permits such provisions as the lender chooses subject to the limitations of subdivision (b). Subdivision (b) does not prohibit a lender from combining the two clauses and thus the combination presumptively is recognized as valid.

The Shadoans argue that the combination of provisions defeats legislative purpose and policy, which they derive from section 7504 subdivision

---

[3]Financial Code section 7504 provides, "Notwithstanding any other provision of law, an association may adjust the interest rate, payment, balance, or term-to-maturity on any loan secured by real property as authorized by the loan contract, subject to the limitations of subdivision (b) and Section 341 of P.L. 97-320 (H.R. 6267, the Garn-St. Germain Depository Institutions Act of 1982)." Subdivision (b) limits adjustments "[T]o the interest rate, payment, balance, or term-to-maturity on home loans . . ." permitting, among other things, both prepayment penalties and unilateral call provisions.

As relevant, Civil Code section 2954.9 provides: "(a) (1) Except as otherwise provided by statute, where the original principal obligation is a loan for residential property of four units or less, the borrower under any note or evidence of indebtedness secured by a deed of trust or mortgage or any other lien on real property shall be entitled to prepay the whole or any part of the balance due, together with accrued interest, at any time.

"(2) Nothing in this subdivision shall prevent a borrower from obligating himself, by an agreement in writing, to pay a prepayment charge."

Financial Code section 7504, subdivision (b)(5)(E) provides that as to home loans, ". . . A loan contract may provide an association with the right to call the loan due and payable either after a specified period of time has elapsed following the date of the loan contract or as specified in a reverse annuity mortgage."

Subdivision (b)(6) states a duty on the part of the lender to disclose to the party seeking a home loan: "(B) A statement about whether the loan contract authorizes the imposition of a late charge or a prepayment charge and, if so, the amount of the charge or the manner in which it is to be determined. . . .

". . . . . . . . . . . . . . . .

"(J) . . . if the loan gives the association the right to call the loan due and payable after a specified period of time has elapsed following the date of the loan contract . . . a statement that a large payment may be due at such time and that the association is not obligated to refinance the loan."

(b)(5)(A) and (b)(5)(B)[4] as mandating that the risk of changes in interest rate be equally shared by the borrower and the lender. We do not so read the cited provisions. The evident purpose of the provisions in an "adjustable rate mortgage" is to ensure that the lender will not increase the periodic payments of a loan over and above the value of money at the time at issue; i.e., that the ratio of purchasing power to a borrower's payments will remain fairly constant over the term of the loan. We decline to read anything more into these provisions.

Finally, the Shadoans argue that the legal theory of unconscionability was developed to protect against just the type of risk shifting as is at issue here.

The relevant law was stated by the court in *A & M Produce Co.* v. *FMC Corp., supra*, 135 Cal.App.3d at page 487: "The most detailed and specific commentaries observe that a contract is largely an allocation of risks between the parties, and therefore that a contractual term is substantively suspect if it reallocates the risks of the bargain in an objectively unreasonable or unexpected manner. [Citations.] But not all unreasonable risk reallocations are unconscionable; rather, enforceability of the clause is tied to the procedural aspects of unconscionability . . . such that the greater the unfair surprise or inequality of bargaining power, the less unreasonable the risk reallocation which will be tolerated. [Citation.]"

We have already noted that the Shadoans' complaint did not allege facts demonstrating the type of inequality of bargaining power making risk reallocation per se unconscionable, and we do not believe that a combination of

---

[4]Subdivision (b)(5)(A) provides: "Adjustments to the interest rate shall correspond directly to the movement of an interest rate index or of a national or regional index that measures the rate of inflation or the rate of change in consumer disposable income, which index is readily available to, and verifiable by the borrower and is beyond the direct control of the association. An association also may increase the interest rate pursuant to a formula or schedule that specifies the amount of the increase and the time at which it may be made and which is set forth in the loan contract. An association, in its sole discretion, may decrease the interest rate at any time."

Subdivision (B) provides: "Adjustments to the payment and the loan balance that do not reflect an interest rate adjustment may be made if: (i) the adjustments reflect a change in a national or regional index that measures the rate of inflation or the rate of change in consumer disposable income, is readily available to and verifiable by the borrower, and is beyond the direct control of the association; (ii) in the case of a payment adjustment, the adjustment reflects a change in the loan balance or is made pursuant to a formula, or to a schedule specifying the percentage or dollar change in the payment as set forth in the loan contract; or (iii) in the case of an open end line of credit loan, the adjustment reflects an advance taken by the borrower under the line of credit, or a payment made by the borrowers, that is permitted by the loan contract."

prepayment and unilateral call clauses in a single loan document is either objectively unreasonable or unexpected. The type of risk allocation generally found to be unconscionable is that where the stronger party shifts the risk of its own *negligence* or the *defectiveness of its product* onto the weaker party. (*A & M Produce Co.* v. *FMC Corp., supra*, 135 Cal.App.3d 473: risk that machine used to process tomatoes would be defective shifted to purchaser by limiting implied warranties; *Henningsen* v. *Bloomfield Motors, Inc., supra*, 161 A.2d 69: risk that automobile would be defective and cause personal injury shifted to purchaser by limiting implied warranties.) It is simply less disturbing and less unexpected that a lender would shift the risk of market fluctuation to the party using the lender's money.

We conclude that the mere combination of the two provisions is not unconscionable, and thus not an unfair business practice as alleged in the complaint. As the Shadoans' only claim of unfair business practice is the unfairness or unconscionability of that combination, their complaint failed to state facts sufficient to state a cause of action, nor does it appear that they would be able to amend their complaint to withstand demurrer.[5] The trial court properly dismissed the action.

## 2. Statute of Limitations

The Shadoans argue that the relevant cause of action accrued on October 19, 1987, when they were "injured" by paying the prepayment penalty. World argues that the Shadoans were "injured" when they entered into an agreement they claim was unconscionable. The parties agree that the applicable statute of limitations for commission of an unfair business practice is four years, as provided by Business and Professions Code section 17208, and that the applicable statute of limitations for an unconscionable contract is set forth in Code of Civil Procedure section 343 and is also four years.[6]

Having determined that the Shadoans' complaint would not entitle them to relief on grounds of unfair business practice or unconscionability of contract, we need not consider whether a cause of action on these legal theories arises at the date the contract was created or on the date the complaining party suffered actual injury. In addition, we need not determine if the parties have correctly concluded that the relief available for

---

[5] World has also argued that the provisions at issue are permitted by federal law, an argument made because, since entering into the agreement with the Shadoans, World converted to a federally chartered savings and loan. Finding that the agreement withstands state law, it becomes unnecessary to determine if the more permissive federal law applies.

[6] Section 343 provides: "An action for relief not hereinbefore provided for must be commenced within four years after the cause of action shall have accrued."

unconscionability of contract—as noted earlier, a defense—is subject to any statute of limitations at all. We decline to decide these issues.

## 3. Attorney Fees

World claimed attorney fees of $10,131.65. The court, on the theory that the fees should be apportioned between the Shadoans' private action for relief from their contract and the action for injunctive relief brought on behalf of themselves and others, awarded World fees of $3,492.

The Shadoans claim that no fees should have been awarded (1) because the action was not instituted by World to enforce a provision of the contract, and (2) because the action was not on the contract but an action seeking to enjoin an unfair business practice.

As relevant, the loan agreement provided, "If legal action is instituted to enforce any of the terms or provisions of this note, the lender shall be entitled to recover all costs and expenses incurred in bringing such action, including reasonable attorney's fees, the amount of which shall be determined by the Court."

It is true that World did not institute the action to enforce a provision of the contract, and that the case therefore does not fall within any express provision of the attorney fees' clause. Civil Code section 1717, however, provides "(a) In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs." Accordingly, where, as here, an attorney fee clause provides for an award of fees incurred in enforcing the contract, the prevailing party is by statute entitled to fees for any action "on the contract." It is settled that it is irrelevant if the fees were incurred offensively or defensively. (*Wagner* v. *Benson* (1980) 101 Cal.App.3d 27, 37 [161 Cal.Rptr. 516]; *IMO Development Corp.* v. *Dow Corning Corp.* (1982) 135 Cal.App.3d 451, 464 [185 Cal.Rptr. 341].) World, therefore, is entitled to its fees to the extent that they were incurred in an action "on the contract."

The more difficult question is whether the action at issue was "on the contract." The action was brought under the Business and Professions Code as an action to enjoin an unfair business

practice.[7] One form of relief sought by the Shadoans was restitution, on the grounds that the prepayment provision of their contract with World was unconscionable and thus part of the unfair business practice; however, they did not seek recovery of their own fees under the contract's attorney fees clause[8] and did not otherwise maintain that the action was "on the contract."

While we have found no authority precisely on point, it is settled that the joinder of a noncontractual cause of action to a contractual cause of action entitles the prevailing party to no more than the fees incurred on the contract cause of action; in such a situation the trial court should apportion the fees. (*Reynolds Metals Co.* v. *Alperson, supra*, 25 Cal.3d at p. 129.) We are of the opinion that the present situation requires a similar result. Here, there are not two distinct causes of action, but a single legal theory seeking different forms of relief, both of which require an adjudication whether the provisions of the contract at issue are not enforceable. Attorney fees would have been available to the prevailing party if the issue of unconscionability had been raised solely as a defense to an action to enforce the contract. It follows that fees should be awarded to the extent that the action in fact is an action to enforce—or avoid enforcement of—the specific contract. Nonetheless, the present action extended far beyond the specific contract between the Shadoans and World. Other persons could have prosecuted the unfair business practices cause of action, and World ordinarily would not be able to recover its fees from such other persons. We see no reason why the Shadoans should be treated specially because they happened to have a contract with an attorney fees clause. It follows that no fees should be awarded to the extent the action was brought solely to enjoin an unfair business practice. The proper procedure would be for the trial court, in its discretion, to apportion the fees so that the losing party is only required to pay for such fees as were incurred in prosecuting, or defending, the contract action. The trial court in the present case followed just such a procedure.

---

[7] The Business and Professions Code does not provide for an award of attorney fees for an action brought pursuant to section 17203, and there is nothing in the statutory scheme from which such a right could be implied (see discussion in *Pachmayr Gun Wks., Inc.* v. *Olin Mathieson Chem. Corp., etc.* (9th Cir. 1974) 502 F.2d 802, 809-813), and thus nothing on which to base an award of fees. "Unless authorized by either statute or agreement, attorney's fees ordinarily are not recoverable as costs." (*Reynolds Metals Co.* v. *Alperson* (1979) 25 Cal.3d 124, 127 [158 Cal.Rptr. 1, 599 P.2d 83].)

[8] The Shadoans did seek fees under Code of Civil Procedure section 1021.5, i.e., on a "private attorney general theory."

## The Cross-appeal

### 1. *Attorney fees*

■ World argues that the trial court's apportionment of fees was improper as the contract action and the unfair business practices action were inextricably interwoven. Attorney fees need not be apportioned when incurred for representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed. (*Reynolds Metals Co.* v. *Alperson, supra,* 25 Cal.3d at pp. 129-130.)

World's position is supported by *Wagner* v. *Benson, supra,* 101 Cal.App.3d 27, in which the plaintiffs sought relief from a provision of a loan agreement on the theory that they had entered into the loan because of the lender's fraudulent misrepresentations. The lender cross-complained for payments due under the loan agreement, an agreement containing an attorney fees provision. The lender prevailed on both the complaint and the cross-complaint and the trial court apportioned its award of attorney fees so that only such fees as were incurred in prosecuting the cross-complaint were awarded. The appellate court reversed, finding that in order to prevail on the cross-complaint and obtain the loan payments, the lender had to prove that no misrepresentation had occurred. The court held that because of the complete interrelation of the issues, the lender should be entitled to all of its attorney fees. (*Id.* at p. 37.)

We see a distinction between an action brought by a party seeking relief on interrelated theories and an action brought by essentially two parties— one acting in a personal capacity and one in a representative capacity—on interrelated theories. The Shadoans in their private capacity, suing on their own contract, would be required to pay all of World's attorney fees. The Shadoans suing entirely in their representative capacity would not be required to pay any of World's attorney fees. Again, we have found no case directly on point. The best solution to the problem, however, appears to be apportionment. Recognizing that apportionment is difficult where, as here, there is an identity of issues, we find that the trial court's apportionment was reasonable in the present case and we will not disturb it.

■ World is also entitled to its reasonable attorney fees on appeal, the amount of which is best determined by the trial court. (*Serrano* v. *Priest* (1977) 20 Cal.3d 25, 49 [141 Cal.Rptr. 315, 569 P.2d 1303].) In the present case, the trial court should both determine the reasonable value of the legal services rendered on behalf of World, and should apportion the fees so that

the Shadoans are required to pay only such fees as reasonably appear to be their share as individuals prosecuting a personal action, and not as representatives of others similarly situated.

## CONCLUSION

The judgment is affirmed. Each party shall bear its own costs on appeal. The order awarding attorney fees is affirmed. The matter is remanded to the superior court for a determination of such attorney fees as should be awarded World on appeal.

Racanelli, P. J., and Holmdahl, J., concurred.

A petition for a rehearing was denied April 26, 1990, and the opinion was modified to read as printed above.