[No. B145102. Second Dist., Div. Five. May 30, 2002.]

J. LYNWOOD WALKER et al., Plaintiffs and Appellants, v. COUNTRYWIDE HOME LOANS, INC., Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III. and IV.A.

**COUNSEL**

Susman Godfrey, Marc M. Seltzer, David H. Boren; Law Offices of Bernard L. Weiner and Bernard L. Weiner for Plaintiffs and Appellants.

Severson & Werson, Jan T. Chilton; and Sanford Shatz for Defendant and Appellant.

---

**OPINION**

**MOSK, J.**—J. Lynwood Walker and Violet Walker (the Walkers) appeal from the trial court's grant of summary judgment in favor of Countrywide Home Loans, Inc. (Countrywide). Countrywide appeals from the court's denial of its motion for attorney fees.

When a borrower is in default on a loan secured by real property, Countrywide conducts inspections of the property, the cost of which Countrywide charges to the delinquent borrower. The Walkers challenge Countrywide's practice of passing the cost of conducting property inspections to delinquent borrowers, contending that the practice is unlawful, unfair, and deceptive under Business and Professions Code section 17200 (the unfair competition law). The Walkers argue property inspection fees are "unlawful" late charges that violate provisions of California's Civil and Financial Codes; the fees are "unfair" in that the utility of charging them to consumers is outweighed by the harm to consumers, they are unethical and they are not permitted by the Walkers' deed of trust; and the fees are "deceptive" because the Walkers' deed of trust does not authorize them.

In the published portion of this opinion, we hold that Countrywide's practice of charging delinquent borrowers with the actual cost of performing property inspections does not violate the unfair competition law. We also hold that the trial court properly denied Countrywide's motion for attorney fees because the Walkers' action was fundamentally one brought under the unfair competition law, which law does not provide for an attorney fees award to the prevailing party. In the unpublished portion of this opinion, we reject the Walkers' claim that the trial court erred when it ruled inadmissible the legislative history of Civil Code section 2954.4 (which section governs late charges on delinquent home loans) and an expert declaration concerning industry custom and practice in charging property inspection fees to borrowers.

We therefore affirm the judgment and affirm the order denying Countrywide's motion for attorney fees.

## FACTUAL BACKGROUND

*The Walkers' Property Inspection Fees*

To purchase their Los Angeles home, the Walkers borrowed $290,000 from Bayside First Mortgage Inc. (Bayside) in June 1995. That loan was

evidenced by a note and secured by a deed of trust on the property, both of which Bayside assigned to Countrywide. The deed of trust required the Walkers not to "destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property." If the Walkers defaulted under the terms of their note, then pursuant to the deed of trust, "Lender may do and pay for whatever is necessary to protect the value of the Property and the Lender's rights in the Property. Lender's actions may include . . . appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. . . . [¶] Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument." The deed of trust also provided, "Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection."

The Walkers defaulted on their loan in November 1996. Countrywide asserts that, in accordance with its usual practice, it gave the Walkers written warnings and collection calls urging them to reinstate the loan, but that Countrywide's efforts were unavailing. Thereafter, Countrywide ordered an inspection of the Walkers' property in January 1997 for which it charged the Walkers $9.50. Thereafter, Countrywide ordered an additional 12 property inspections that were performed approximately every 30 days and charged the Walkers for the inspections as follows: March 1997, $9.50; April 1997, $9.50; May 1997, $9.50; June 1997, $9.50; July 1997, $9.50; July 1997, $8.50; August 1997, $8.50; October 1997, $8.50; October 1997, $8.50; December 1997, $8.50; December 1997, $8.50; and February 1998, $10. The inspections showed that the Walkers continued to occupy and maintain the property.

On at least two occasions, no one was home at the time of the inspections, but the inspector left a calling card. Violet Walker testified that the first time she recalled learning that Countrywide had charged for property inspections was during the bankruptcy refinance period, which date is not in the record. J. Lynwood Walker testified that until February 1998 the Walkers had been unaware that there were inspections of their property.

By January 1998, the Walkers had not cured their default. Therefore, Countrywide noticed a foreclosure sale of the Walkers' home. In February 1998, the day before the foreclosure sale date, the Walkers paid off their loan, although the record does not specify in what manner they did so. The Walkers also paid the $118 charge for the 13 property inspections.

*Countrywide's Property Inspection Practice*

Countrywide enters into and buys home mortgage loan contracts secured by real property and sells the loans to secondary market investors. After

selling the loans, Countrywide continues to administer or "service" them on the investors' behalf. Federal National Mortgage Association (Fannie Mae), Federal Home Loan Mortgage Corporation (Freddie Mac), and Government National Mortgage Association (Ginnie Mae) own the majority of loans Countrywide services.

Freddie Mac and Fannie Mae publish guidelines concerning when loan servicers, such as Countrywide, should conduct property inspections. Freddie Mac requires a loan servicer within 45 to 59 days of a loan default to conduct a property inspection and face-to-face interview with the borrower if no arrangements have been made to bring a delinquent mortgage current. (2 Fed. Home Loan Mortgage Corp., Single-Family Seller/Servicer Guide (July 31, 1994) ch. 64, § 64.6, pp. 64-67.) Inspections continue every month thereafter until satisfactory repayment arrangements have been made. (*Ibid.*) Similarly, Fannie Mae's servicing guidebook states that a "[p]art of a servicer's responsibility for safeguarding the integrity of the properties securing mortgages [that Fannie Mae has] purchased or securitized includes making periodic inspections of the property . . . . [¶] . . . [¶] The servicer must inspect a property that secures a delinquent first mortgage before the 60th day of delinquency. . . . After the servicer's initial inspection and until such time as the mortgage is referred for foreclosure, the servicer should schedule subsequent property inspections for delinquent mortgages as often as it considers necessary to protect our interests." (Fed. Nat. Mortgage Assn., Servicing (Sept. 30, 1996) ch. 3, § 303, p. 321.) Once a property has been referred for foreclosure, the servicer must inspect the property at least every 30 days, and 30 days before the foreclosure sale. (*Ibid.*)

When a default on a loan secured by residential property occurs, Countrywide's computer program orders property inspections depending on the existence of factors such as the amount of time the loan has been delinquent and whether the property is subject to a foreclosure sale. Countrywide orders follow-up inspections each month if the default is not cured. Beginning in 1999, after the inspections of the Walkers' property took place, when a borrower defaulted on a loan, before inspecting the property, Countrywide sent a written notice to the borrower that Countrywide would conduct periodic property inspections so long as the loan remained delinquent and that the borrower would be responsible for paying the cost of those inspections.

Countrywide's expressed primary purpose in conducting the property inspections is to ascertain whether the home is occupied. To that end, and depending on the particular circumstances of a delinquent loan, Countrywide

orders one of three types of property inspections: (1) an inspection to "verify occupancy," which inspection may include an inspector contacting neighbors to determine who, if anyone, is occupying the property; (2) in the event the borrower has commenced a bankruptcy proceeding, a "bankruptcy drive-by" inspection by which the investigator verifies occupancy by means other than contacting the property's resident; and (3) for an unoccupied property, a "vacant walk-thru" inspection, which inspection includes examining the property's interior and exterior.

A "verify occupancy" inspection cost Countrywide $9.50 in 1995; $10 in 1998; and $12 in 1999. A "bankruptcy drive-by" inspection cost $8.50 in 1995; $9 in 1998; and $11 in 1999. A "vacant walk thru" inspection cost $15 in 1995; $15.75 in 1998; and $17.75 in 1999. Countrywide charged these costs, without markup, to the delinquent borrower. The costs are included in the borrower's monthly bills, and, if they are not paid and there is a foreclosure on the property, Countrywide seeks reimbursement of the property inspection costs from the owner of the loan. Countrywide charges the borrower only the cost of property inspections performed before a notice of default is recorded.

Of about 3,000 inspections performed per month, approximately 10 percent reveal that the property is vacant. Based on the property inspection report, Countrywide may change locks and make repairs, protect the property against vandalism, winterize the property, and drain the swimming pool.

Since late 1997, Countrywide subcontracted performing the inspections to Countrywide Field Services Corporation, a company affiliated with Countrywide. Countrywide paid just over $6 million to perform property inspections from 1995 to 1999. It collected from borrowers $1,278,594.28 in inspection fees from March 1995 to January 2000. Countrywide Field Services Corporation makes about a $3 profit on each property inspection.

*The Walkers' Lawsuit*

The Walkers filed their complaint on March 12, 1999, claiming to be private attorneys general. Seeking declaratory relief, injunctive relief and damages, the Walkers alleged Countrywide "regularly and routinely imposes upon borrowers" a property inspection fee upon default that is actually a "disguised" late fee.

Countrywide filed its motion for summary judgment or, in the alternative, summary adjudication of issues. In opposition to the motion, the Walkers submitted the expert declaration of a mortgage banking consultant, who

stated that in her experience she had not encountered a loan servicing institution such as Countrywide that conducted multiple property inspections in connection with a loan default or imposed the fees for such inspections on the borrower. The expert declared that such fees are borne by the loan servicer or mortgagor. The Walkers also submitted a request for judicial notice of the legislative history of Civil Code section 2954.4, which section sets a ceiling on the amount that may be charged as a late fee on a delinquent home loan installment. Countrywide submitted written objections to the expert's declaration and the request for judicial notice on the grounds of, among others, relevancy and lack of personal knowledge. After sustaining the objections, the trial court granted summary judgment for Countrywide. The court rejected the Walkers' contentions that charging property inspection fees to the borrower is unlawful, unfair or deceptive.

Thereafter, Countrywide moved for its attorney fees, citing Civil Code section 1717 and attorney fees clauses in the Walkers' note and deed of trust. The Walkers opposed the motion on the grounds, among others, that it was untimely and that Business and Professions Code section 17200 does not provide for an award of attorney fees to the prevailing party. The Walkers also argued that if fees were awardable, then fees should be apportioned so that fees the Walkers incurred on behalf of the general public were not recoverable. The trial court denied Countrywide's motion for attorney fees based on its conclusion that "fundamentally this case was solely an action to enjoin an allegedly unfair business practice. . . ."

The Walkers appealed the trial court's judgment, and Countrywide appealed the court's order denying attorney fees.

DISCUSSION

I. *Standards of Review*

■ We review de novo the trial court's decision to grant summary judgment. (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 65, 67-68 [99 Cal.Rptr.2d 316, 5 P.3d 874].) The court's stated reasons for granting summary judgment are not binding on us because we review its ruling, not its rationale. (*Szadolci v. Hollywood Park Operating Co.* (1993) 14 Cal.App.4th 16, 19 [17 Cal.Rptr.2d 356].) On appeal, this court exercises its independent judgment in determining whether there are triable issues of material fact and whether the moving party therefore is entitled to judgment as a matter of law. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334-335 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the

parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493].) The court's evidentiary rulings made on summary judgment are reviewed for abuse of discretion. (*People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 639-640 [92 Cal.Rptr.2d 115].)

■ Orders denying or granting an award of attorney fees are also generally reviewed using an abuse of discretion standard of review. (*Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615, 621 [98 Cal.Rptr.2d 388].) But a "determination of whether the criteria for an award of attorney fees and costs have been met is a question of law." (*Ibid.*) To the extent we determine in what circumstances attorney fees may be recovered in an action that alleges a claim under the unfair competition law, we review the trial court's order de novo. To the extent the trial court had discretion to deny attorney fees, we review that determination using the abuse of discretion standard.

## II. *Unfair Competition Law*

### A. *The Tests*

■ The major purpose of Business and Professions Code section 17200—the unfair competition law[1]—is the "preservation of fair business competition. [Citation.]" (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527] (*Cel-Tech Communications*).) "As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice . . . ." (Bus. & Prof. Code, § 17200.) The California Supreme Court confirmed that the test for determining a violation of the unfair competition law is a disjunctive one; namely, a plaintiff may show that the acts or practices at issue are either unlawful *or* unfair *or* deceptive. (*Cel-Tech Communications, supra,* at p. 180.)

#### 1. *Unlawful*

A business practice is "unlawful" if it is "forbidden by law." (*Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 383 [6 Cal.Rptr.2d 487, 826 P.2d 730] [citing *Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d

---

[1]Business and Professions Code section 17200 does not bear a legislatively imposed title or name, but has been referred to as the "unfair competition law" or the "UCL." (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 558, fn. 2 [71 Cal.Rptr.2d 731, 950 P.2d 1086].)

94, 113 [101 Cal.Rptr. 745, 496 P.2d 817]].) The unfair competition law thus creates an independent action when a business practice violates some other law. (*Farmers Ins. Exchange v. Superior Court, supra,* at p. 383.)

### 2. *Unfair*

No clear test to determine what constitutes an unfair business practice has been established in California. One court has said that an unfair business practice is one that "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers" (*People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 530 [206 Cal.Rptr. 164, 53 A.L.R.4th 661]), and another court has stated that to determine whether a business practice is unfair, courts must " 'weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . .' " (*State Farm Fire & Casualty Co. v. Superior Court* (1996) 45 Cal.App.4th 1093, 1104 [53 Cal.Rptr.2d 229].) The California Supreme Court criticized these tests as being "too amorphous and provid[ing] too little guidance to courts and businesses," but declined to formulate a test for consumer actions. (*Cel-Tech Communications, supra,* 20 Cal.4th at p. 185 & fn. 12 [adopting test of unfairness in anticompetitive actions].) As discussed below, we need not decide which of these tests applies here because we hold that under either test Countrywide's practice of charging property inspection fees to delinquent borrowers is fair.

### 3. *Deceptive*

To show that a business practice is deceptive, a plaintiff suing under the unfair competition law need only show that members of the public are likely to be deceived. (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 209, 211 [197 Cal.Rptr. 783, 673 P.2d 660]; see also *State Farm Fire & Casualty Co. v. Superior Court, supra,* 45 Cal.App.4th at p. 1105 ["This means that a [Business and Professions Code section] 17200 violation, unlike common law fraud, can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage"].)

### B. *Unlawfulness of the Property Inspection Fee*

The Walkers contend Countrywide's practice of passing the cost of property inspections to borrowers violates (1) Civil Code section 2954.4, (2) Civil Code sections 2924c and 2924d, and (3) Financial Code section 50130 et seq. Nothing in these sections prohibits Countrywide from charging the cost of property inspections to a delinquent borrower.

### 1. *Civil Code Section 2954.4*

■ The Walkers contend charging property inspection fees to delinquent borrowers violates statutory restrictions concerning late fees. Legislative restrictions on late fees on home loan installment payments originated with *Garrett v. Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731 [108 Cal.Rptr. 845, 511 P.2d 1197, 63 A.L.R.3d 39] (*Garrett*). At issue in *Garrett* was a charge for late payment of a loan installment. The court held that a charge that is "an attempt to coerce timely payment by a forfeiture which is not reasonably calculated to merely compensate the injured lender" is void as a penalty. (*Id.* at p. 740.) The court also noted that when actual damages are small and the costs of ascertaining them would be "economically impracticable in each instance of a default to require a lender to prove to the satisfaction of the borrower the actual damages by accounting procedures," a negotiated liquidated damages provision may be given effect. (*Id.* at p. 742.)

In response to *Garrett*, the Legislature enacted Civil Code section 2954.4,[2] the provision the Walkers invoke as prohibiting Countrywide from charging property inspection fees to delinquent borrowers. Section 2954.4 limits the amount that may be charged as a late fee on a delinquent home loan to 6 percent of the installment applicable to the payment of principal and interest on the loan or five dollars, whichever is greater. (*Weber, Lipshie & Co. v. Christian* (1997) 52 Cal.App.4th 645, 654 [60 Cal.Rptr.2d 677]; see also Civ. Code, § 2954.5 [requiring notice to delinquent borrower prior to imposition of late fee].)

The legislative history of Civil Code section 2954.4 in the record, even if considered, does not show that property inspection fees are, or should be, considered late fees and hence prohibited by that section. (See generally Assem. Com. on Finance and Insurance, Background Information Relative to the Costs Associated with the Consummation and Financing of Real Property Transactions (Nov. 1974) pp. 33-40; Dugald Gillies, Cal. Assn. of Realtors: Statement on Costs Associated with Real Property Financing Transactions, Nov. 13, 1974.) The legislative history suggests that the

---

[2]Civil Code section 2954.4, subdivision (a) provides, in pertinent part: "(a) A charge that may be imposed for late payment of an installment due on a loan secured by a mortgage or a deed of trust on real property containing only a single-family, owner-occupied dwelling, shall not exceed either (1) the equivalent of 6 percent of the installment due that is applicable to payment of principal and interest on the loan, or (2) five dollars ($5), whichever is greater. A charge may not be imposed more than once for the late payment of the same installment. However, the imposition of a late charge on any late payment does not eliminate or supersede late charges imposed on prior late payments. A payment is not a 'late payment' for the purposes of this section until at least 10 days following the due date of the installment."

Legislature was concerned about prohibiting late charges from being imposed more than once for the late payment of the same installment and establishing uniformity of such charges. The Legislature, in considering how to deal with late charges, did not consider whether property inspection fees are "late fees."

The Walkers' reference to one treatise that suggests, without citing any authority, that property inspection fees are "late charges" does not establish that inspection fees are, in fact, late charges. (4 Miller & Starr, Cal. Real Estate (3d ed. 2000) Deeds of Trust and Mortgages, § 10.80, p. 242.) They are not. As noted in *Garrett*, late charges on delinquent home loans serve two fundamental purposes—they compensate the lender for administrative expenses and for the cost of money wrongfully withheld, and they encourage timely payment. (*Garrett, supra,* 9 Cal.3d at pp. 739-740.) A property inspection fee does not serve these purposes. It is not designed to encourage timely payment or to compensate the lender for loss of interest on the late payment. Rather, the property inspection fee reflects the actual cost the lender incurs to protect its security. Property inspection fees also are not triggered merely by a default on a home loan. Countrywide orders property inspections only if certain criteria are established, including what type of loan is in default and how long the loan has been delinquent. For example, the Walkers defaulted on their loan in November 1996, and Countrywide did not order the first inspection of the Walkers' property until several months later in January 1997.

These characteristics of property inspection fees distinguish them from the disguised late charge at issue in *Ridgley v. Topa Thrift & Loan Assn.* (1998) 17 Cal.4th 970, 979 [73 Cal.Rptr.2d 378, 953 P.2d 484]. In that action, the California Supreme Court held invalid as a penalty a provision that the borrower owed the lender a prepayment fee at the time of sale only if the borrower had been more than 15 days late with any scheduled interest payment. The court looked to the substance of the provision at issue rather than its form and held that the provision was a disguised penalty because the condition of the provision's operation—the late payment of interest—logically was unrelated to the purported function of the charge as compensation for prepayment. (*Id.* at p. 981.) "The charge provision is, instead, plainly intended as an incentive for prompt payment of interest." (*Ibid.*) In contrast to the prepayment fee in *Ridgley*, the property inspection fee here is based on a necessary procedure that furthers the legitimate business purpose of protecting a lender's security. Nothing in Civil Code section 2954.4 precludes charging property inspection fees to delinquent borrowers in furtherance of that purpose.

## 2. Civil Code Sections 2924c and 2924d

█ Civil Code sections 2924c and 2924d do not prohibit property inspection fees from being charged to a delinquent borrower. They limit the fees that may be charged if a loan is reinstated or redeemed. Civil Code section 2924c, subdivision (a)(1), gives the mortgagor a right to cure a default by paying the amount in default, plus "reasonable costs and expenses," thereby reinstating the loan as if the default had not occurred.[3] The reasonable costs and expenses to which the mortgagor is limited to recovering are those "incurred for recording, mailing, including certified and express mail charges, publishing, and posting notices . . . and a fee for a trustee's sale guarantee or, in the event of judicial foreclosure, a litigation guarantee." (Civ. Code, § 2924c, subd. (c).) Civil Code section 2924d also contains this limitation on the reasonable costs a lender may charge to a borrower seeking to redeem property after a notice of sale has been recorded.[4]

---

[3]Civil Code section 2924c provides, in pertinent part: "(a)(1) Whenever all or a portion of the principal sum of any obligation secured by deed of trust or mortgage on real property or an estate for years therein hereafter executed has, prior to the maturity date fixed in that obligation, become due or been declared due by reason of default in payment of interest or of any installment of principal, or by reason of failure of trustor or mortgagor to pay, in accordance with the terms of that obligation or of the deed of trust or mortgage, taxes, assessments, premiums for insurance, or advances made by the beneficiary or mortgagee in accordance with the terms of that obligation or of the deed of trust or mortgage, the trustor or mortgagor . . . at any time within the period specified in subdivision (e), if the power of sale therein is to be exercised, or, otherwise at any time prior to entry of the decree of foreclosure, may pay to the beneficiary or the mortgagee . . . the entire amount due, at the time payment is tendered, with respect to (A) all amounts of principal, interest, taxes, assessments, insurance premiums, or advances actually known by the beneficiary to be, and that are, in default and shown in the notice of default, under the terms of the deed of trust or mortgage and the obligation secured thereby, (B) all amounts in default on recurring obligations not shown in the notice of default, and (C) all reasonable costs and expenses, subject to subdivision (c), which are actually incurred in enforcing the terms of the obligation, deed of trust, or mortgage, and trustee's or attorney's fees, subject to subdivision (d), other than the portion of principal as would not then be due had no default occurred, and thereby cure the default theretofore existing, and thereupon all proceedings theretofore had or instituted shall be dismissed or discontinued and the obligation and deed of trust or mortgage shall be reinstated and shall be and remain in full force and effect, the same as if the acceleration had not occurred. . . . For the purposes of this subdivision, the term 'recurring obligation' means all amounts of principal and interest on the loan, or rents, subject to the deed of trust or mortgage in default due after the notice of default is recorded; . . . [¶] . . . [¶] (e) Reinstatement of a monetary default . . . may be made at any time within the period commencing with the date of recordation of the notice of default until five business days prior to the date of sale set forth in the initial recorded notice of sale."

[4]Civil Code section 2924d provides, in pertinent part: "(a) Commencing with the date that the notice of sale is deposited in the mail, . . . and until the property is sold pursuant to the power of sale contained in the mortgage or deed of trust, a beneficiary, trustee, [or] mortgagee . . . may demand and receive from a trustor, [or] mortgagor . . . those reasonable costs and

Civil Code sections 2924c and 2924d thus regulate costs that may be charged to a borrower only after notices of default and sale have been recorded. They do not apply to charges incurred before such notices have been recorded. For example, Civil Code section 2924c refers to the payment of the amount due as "shown in the notice of default." The notice of default provides notice to the borrower and other interested parties of the specific amount that is owed so that the default can be cured. (*Little v. Harbor Pacific Mortgage Investors* (1985) 175 Cal.App.3d 717, 720 [221 Cal.Rptr. 59].) After the notice of default is recorded, borrowers are responsible only for the amounts stated in the notice of default plus specific costs and expenses delineated by statute. (See, e.g., *ibid.*; see also Civ. Code, §§ 2924c, 2924d.)

Significantly, a notice of default may include such costs as attorney fees incurred prior to the notice's recordation. (*Caruso v. Great Western Savings* (1991) 229 Cal.App.3d 667, 676-677 [280 Cal.Rptr. 322] [attorney fees incurred in prosecuting a foreclosure are statutorily limited, but other fees relating to protection of the lender's deed of trust are not so limited]; see also *Bruntz v. Alfaro* (1989) 212 Cal.App.3d 411, 421 [260 Cal.Rptr. 488] [Civ. Code, § 2924c limits costs and trustee's or attorney fees which may be claimed as foreclosure expenses, but does not limit other expenses "incurred for other purposes"].) *After* a notice of default is recorded, except in certain circumstances, a lender or beneficiary is limited to recovering statutorily limited attorney or trustee fees. (Civ. Code, §§ 2924c, subd. (d), 2924d, subd. (a).) There is no reason why reasonable attorney fees incurred *before* a notice of default is recorded can be charged to a borrower and reasonable property inspection fees incurred during that same time period cannot be charged. Both are fees incurred to protect the lender's security. Here, Countrywide agrees that it is not permitted to, and does not, charge to delinquent borrowers property inspection fees incurred *after* a loan is referred for foreclosure.[5]

### 3. *Financial Code Section 50130 et seq.*

Financial Code section 50130 et seq. prohibits regulated residential mortgage loan servicers, such as Countrywide, from charging amounts in excess of those permitted by law. (See, e.g., Fin. Code, §§ 50130, subd. (g) [requiring licensed mortgage servicers to comply with applicable California and federal law requirements], 50204, subd. (i) [prohibiting a licensee from

---

expenses, to the extent allowed by subdivision (c) of Section 2924c . . . . For purposes of this subdivision, the unpaid principal sum secured shall be determined as of the date the notice of default is recorded."

[5]There is no claim on appeal that Countrywide improperly charged to the Walkers property inspection fees incurred after the recordation of any notice of default.

engaging in acts in violation of Bus. & Prof. Code §§ 17200 and 17500], 50500 [penalty for willful violation of code provisions], 50501 [civil penalties for violation of code provisions], and 50504, subd. (a) [interest recoverable on amounts charged in violation of California Residential Mortgage Lending Act].) The unfair competition law forbids business practices that violate some other law. (*Farmers Ins. Exchange v. Superior Court, supra,* 2 Cal.4th at p. 383.) The Financial Code provisions—the "other law" to which the Walkers point—merely require loan servicers to comply with applicable law. The Financial Code sections do not include any law forbidding the charging of property inspection fees to delinquent borrowers.

Thus, there is no specific provision in either the Financial or Civil Code barring Countrywide from charging defaulting borrowers for property inspection fees incurred prior to the recordation of a notice of default, and accordingly, there is no violation of law that would give rise to a cause of action under the unfair competition law.

### C. *Unfairness of the Property Inspection Fee*

The Walkers argue that charging the fees is unfair for four reasons: (1) the harm to the borrower outweighs the utility of charging the fees to the delinquent borrower, and the fees are unethical; (2) the Walkers' deed of trust does not permit the fees to be charged to the borrower; (3) the inspections are performed by Countrywide's affiliated company; and (4) the fees are not authorized by federal servicing guidelines.

#### 1. *Utility of Charging Fees to Delinquent Borrowers*

■ The issue of utility to determine fairness under the unfair competition law may be determined as a matter of law. (See *Motors, Inc. v. Times Mirror Co.* (1980) 102 Cal.App.3d 735, 740 [162 Cal.Rptr. 543].) "If, as will often be the case, the utility of the conduct clearly justifies the practice, no more than a simple motion for summary judgment would be called for." (*Ibid.*)

■ Such is the case here. The cost of Countrywide's property inspection, even of multiple inspections, is insignificant when compared with their utility. (Cf. *Bondanza v. Peninsula Hospital & Medical Center* (1979) 23 Cal.3d 260, 266-267 [152 Cal.Rptr. 446, 590 P.2d 22] [contract requiring payment of one-third of balance due at time of assignment for collection without regard to the actual cost of collection violated unfair competition law].) Countrywide submitted evidence showing that before and after a foreclosure sale, about 10 percent of the homes inspected are vacant. About

5 percent of the homes are unoccupied before a foreclosure sale. To protect vacant properties, Countrywide may change the locks, cut the grass, and lock windows and gates.

Even if an initial inspection reveals that the home continues to be occupied and maintained, a lender has legitimate reasons to reinspect the property every 30 to 60 days thereafter. Countrywide charged $9.50 for a verify occupancy inspection in 1995, and that fee increased to $12 in 1999. For 13 property inspections, Countrywide charged $118 to the Walkers. This figure is not an unreasonable amount to protect the real estate security from damage or deterioration. This is especially true given that, as discussed above, reasonable attorney fees incurred prior to notice of default to protect the lender's security may be charged to the borrower. The status and ability of a borrower unable to make monthly loan payments is uncertain and conceivably could change from month to month. Such a borrower might be unable to maintain the property and is less likely to occupy the property than a borrower current on a loan. For example, Fannie Mae loan servicer guidelines require inspections until the borrower has made repayment arrangements, thereby suggesting that occupancy *and* the borrower's ability to maintain the property are valid reasons for continued inspections. There is nothing "unethical" about passing a reasonable cost of protecting the security to a defaulting borrower. (See *People v. Casa Blanca Convalescent Homes, Inc., supra,* 159 Cal.App.3d at p. 530.)

### 2. *Deed of Trust*

██ The Walkers' deed of trust, reasonably read, does permit inspection costs to be charged to the delinquent borrower. Paragraph 7 of the deed of trust, entitled "Protection of Lender's Rights in the Property," states that if the borrower fails to perform the agreement's covenants, then "Lender may do and pay for whatever is necessary to protect the value of the Property and the Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. . . . [¶] Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument." The deed of trust at paragraph 9 permits the lender to make reasonable inspections of the property upon giving notice at the time of or before an inspection.

An Illinois federal court held that similar deed of trust provisions were sufficient to authorize passing the cost of property inspections to the borrower. (*Majchrowski v. Norwest Mortgage, Inc.* (N.D.Ill. 1998) 6 F.Supp.2d

946.) In *Majchrowski*, the plaintiffs brought a class action suit in which they claimed that their mortgage company committed unfair and deceptive practices when the mortgage company filed a proof of claim that requested a $66 property inspection fee in plaintiffs' bankruptcy proceeding. (*Id.* at p. 949.) The court held that the deed of trust language "unequivocally [permitted] the lender to take whatever action is necessary to (1) protect the mortgaged property's value and (2) the lender's rights in the property," including passing the cost of property inspections to its borrowers. (*Id.* at p. 965.) "There is no limitation on what the lender may do and pay for except that it must be necessary to protect its rights in or the value of the property." (*Ibid.*)

The *Majchrowski* court distinguished *In re Burwell* (Bankr. E.D.Pa. 1989) 107 B.R. 62, upon which the Walkers rely, because the parties' mortgage document in *Burwell* did not contain the broad language in issue in *Majchrowski*. The security instrument in *Burwell* was interpreted by that court as addressing governmental fees that might encumber property. It did not address "any sort of fees to discover or remedy conditions extant on the property which could deflate its value as security, which presumably the inspections are performed to uncover." (*Burwell, supra,* 107 B.R. at p. 66.) The court in *Majchrowski* did not rely upon *Burwell* and "other bankruptcy court decisions" because (1) it recognized that the lender may charge fees to the borrowers if authorized by the mortgage contract; (2) the differences in the language of the contracts; and (3) cases decided in bankruptcy proceedings apply different standards and burdens of proof and are not binding.

Just as the *Majchrowski* court concluded, we conclude that the deed of trust "unequivocally permits" Countrywide to charge the Walkers with the reasonable cost of the property inspections. The deed of trust put the Walkers on notice that inspections could occur in the event of a default. It informed them that the lender, after a default, may take any action necessary to protect the lender's rights in the property and the costs of such actions "shall become the additional debt of borrower." There is nothing inherently unfair about the provision. The "unfairness" element of the unfair competition law "does not give the courts a general license to review the fairness of contracts." (*Samura v. Kaiser Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284, 1299, fn. 6 [22 Cal.Rptr.2d 20].) Inspecting property after a default is an action that reasonably may be necessary to protect a lender's security interest.

### 3. *Affiliated Company*

■ That Countrywide's affiliated company performed the property inspections does not render the practice of charging property inspection fees to

the borrower unfair. There is no evidence showing that Countrywide's use of an affiliated company to perform inspections is unfair or unethical. The record does not show that Countrywide disregarded separate corporate identities or charged fees for inspections not performed. Using an affiliated company conceivably could reduce transaction costs and increase efficiency, to the consumer's benefit.

### 4. Federal Servicing Guidelines

The Walkers correctly point out that federal agency servicing guidelines such as those Freddie Mac and Fannie Mae promulgate do not require Countrywide to impose the cost of property inspections on the borrower. Nevertheless, that the guidelines affirm the utility of performing property inspections is persuasive evidence that the fees are fair as a necessary expense incurred by a lender to protect its security. It is not unfair to transfer a necessary, reasonable, and actual expense to the delinquent borrower.

Thus, under any of the possible applicable criteria, Countrywide's imposition of the inspection fee upon the defaulting borrower is not unfair.

### D. Deceptive Nature of the Property Inspection Fee

The Walkers claim that they were "likely to be deceived" because the deed of trust they signed was "silent on property inspections fees," and at the time the Walkers entered into their loan agreement, they were not notified of Countrywide's practice of imposing property inspection fees. As noted above, the deed of trust contained language that was sufficient to notify the Walkers that such fees could be imposed on them. That the deed of trust does not expressly state that property inspection fees may be charged to the borrower after default does not preclude Countrywide from doing so when the deed of trust unambiguously permits the lender to charge the delinquent borrower for "whatever" is necessary to protect the property's value, "including" attorney fees and entering the property to make repairs, and puts the borrower on notice that property inspections may be performed. (See *Federal National Mortgage Assn. v. Bugna* (1997) 57 Cal.App.4th 529, 535 [67 Cal.Rptr.2d 233] [only when a document is ambiguous will it be construed against the drafter].) The deed of trust is not deceptive or likely to deceive borrowers with regard to property inspection fees.

For the foregoing reasons, the inspection fees in this case do not violate the unfair competition law.

III. *Evidentiary Objections\**

. . . . . . . . . . . . . . . . . . . . . . . . . .

IV. *Countrywide's Cross-appeal*

Countrywide contends it is entitled to its attorney fees under the terms of the Walkers' note and deed of trust because the fundamental nature of the Walkers' action was one in connection with the enforcement of the note and deed of trust. Countrywide also reasons that had the Walkers refused to pay the property inspection fees and Countrywide filed suit to recover the fees, then Countrywide, as the prevailing party in such an action, could have recovered its attorney fees. The Walkers contend that an award of attorney fees is not proper because Countrywide's fee motion was untimely and the action was not filed "on the contract," but rather pursuant to the unfair competition law, which law does not provide for an attorney fees award to the prevailing party. Although Countrywide's motion was timely, the trial court properly denied it.

A. *Timeliness of Countrywide's Attorney Fees Motion\**

. . . . . . . . . . . . . . . . . . . . . . . . . .

B. *Recoverability of Attorney Fees in an Unfair Competition Law Action*

 The trial court denied Countrywide's motion for attorney fees because it concluded the action was "fundamentally" one to enjoin an unfair business practice under the unfair competition law. The unfair competition law does not provide for attorney fees, and relief is generally limited to injunctive relief and restitution. (*Cel-Tech Communications, supra,* 20 Cal.4th at p. 179; *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 173 [96 Cal.Rptr.2d 518, 999 P.2d 706] ["It [an action brought pursuant to the unfair competition law] is not an all-purpose substitute for a tort or contract action"]; see also *Shadoan v. World Savings & Loan Assn.* (1990) 219 Cal.App.3d 97 [268 Cal.Rptr. 207] (*Shadoan*).)

 If a plaintiff prevails in an unfair competition law claim, it may seek attorney fees as a private attorney general pursuant to Code of Civil Procedure section 1021.5. There is no provision for such a right for a successful defendant. A defendant, however, may recover attorney fees if the plaintiff alleged or prosecuted a non-unfair-competition-law theory of recovery permitting the prevailing party to recover attorney fees. Under such

---

\*See footnote, *ante,* page 1158.

circumstances, the trial court may apportion attorney fees incurred in connection with the alternative theory.

For example, in *Shadoan*, the plaintiffs prepaid their loan plus a penalty as required by their loan agreement. In a single cause of action, the Shadoans sued World Savings & Loan Association pursuant to Business and Professions Code section 17200 and Civil Code section 1670.5 (contract unenforceable because unconscionable), and alleged that the prepayment penalty provision was an unfair business practice. (*Shadoan, supra,* 219 Cal.App.3d at pp. 101, 108.) The trial court sustained the defendant's demurrer without leave to amend, and the defendant moved for its attorney fees. (*Id.* at p. 107.) The Court of Appeal held that the trial court properly apportioned attorney fees between those recoverable fees incurred in connection with the Shadoans' *private* action for relief from their contract and those unrecoverable fees incurred in connection with the Shadoans' efforts to enjoin an unfair business practice. (*Ibid.*; see also *Californians for Population Stabilization v. Hewlett-Packard Co.* (1997) 58 Cal.App.4th 273, 294-296 [67 Cal.Rptr.2d 621].)

A rule of apportionment furthers a purpose of the unfair competition law—namely, enforcing consumers' rights, making it economically feasible to sue when individual claims are too small to justify the expense of litigation, and encouraging attorneys to undertake private enforcement actions. (*Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 126 [96 Cal.Rptr.2d 485, 999 P.2d 718].) Thus, where a plaintiff sues solely under the unfair competition law, fees may not be recovered by a prevailing defendant. But if a plaintiff does not bring suit solely under the unfair competition law, the trial court has discretion to apportion fees to claims not brought pursuant to that law—as long as those claims authorize attorney fees awards.

 Countrywide incorrectly suggests that the trial court failed to follow these principles. The trial court, citing Business and Professions Code section 17203 and *Shadoan* stated, "The Court concludes that fundamentally this case was solely an action to enjoin an allegedly unfair business practice, and that moving party's reliance on the underlying note and deed of trust to support an award of attorney's fees, or at least an apportionment of the fees between statutory and contractual bases of recovery is therefore misplaced. The Court notes that because of the monetary insignificance of any recovery plaintiffs, if successful, might have had on a contractual claim, it seems improbable they would have brought any action at all but for the prospect of a large recovery on their statutory claim."

The trial court's order clearly states it considered *Shadoan*. Having done so, the court concluded that the action was principally one to enjoin an unfair

business practice. The court had the discretion to make that determination. (*Shadoan, supra,* 219 Cal.App.3d at p. 109 ["Recognizing that apportionment is difficult where, as here, there is an identity of issues, we find that the trial court's apportionment was reasonable in the present case and we will not disturb it"]; see also *Notrica v. State Comp. Ins. Fund* (1999) 70 Cal.App.4th 911, 955 [83 Cal.Rptr.2d 89] ["The trial court did not see fit to apportion the fee award, and there is nothing in this case that persuades us that it was 'clearly wrong.' [Citation.]"].) Here, the court did not abuse its discretion.

### DISPOSITION

The trial court's judgment and the order denying attorney fees to Countrywide are affirmed. The parties are to bear their own costs on appeal.

Turner, P. J., and Grignon, J., concurred.