Filed 3/17/23  The Palace at Washington Square v. Mechanics  Bank CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| THE PALACE AT WASHINGTON SQUARE, LLC,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>MECHANICS BANK,<br><br>    Defendant and Respondent. | A164195, A164799<br><br>(City & County of San Francisco Super. Ct. No. CGC-19-578060) |

The Palace at Washington Square (Palace), plaintiff in this action, entered into a loan agreement with defendant Mechanics Bank (Bank) to fund construction of a residential and commercial building.  As the maturity date of the construction promissory note approached and passed, the parties engaged unsuccessfully in negotiations to extend it.  Bank eventually demanded payment of the loan balance as well as attorney fees incurred in efforts to enforce its rights, and subsequently filed an action for appointment of a receiver.  Palace paid the amount Bank demanded, which included attorney fees already incurred and a reserve for future legal expenses.

In this action, Palace alleges that Bank did not negotiate in good faith in violation of the implied covenant of good faith and fair dealing and that its actions amounted to economic duress.  After trial, a referee ruled against

1

Palace on the causes of action before him, and awarded Bank contractual attorney fees. Palace appeals the judgment and fee award. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Construction Loan Documents

Palace and Bank entered into a construction loan agreement on February 22, 2016, under which Bank agreed to lend an amount not to exceed $18,500,000 to finance construction of a five-story condominium project in San Francisco. The loan agreement required Palace to complete construction no later than December 1, 2017. The loan proceeds were to be advanced to Palace in disbursements, with all principal, interest, and other amounts "due and payable in full" on the loan's maturity date, defined as two years from the date of the agreement unless an event of default occurred. Disbursements were to be paid only if there was no default, defined in Paragraph 19.1 of the loan agreement to include Palace's failure "to make any principal, interest, or other payment when due and payable," Palace's failure to perform non-monetary covenants or conditions if certain notice requirements were met, or a construction delay rendering it unlikely the project would be completed by the completion date. Palace was prohibited from "suffer[ing] or permit[ing] any mechanics' lien to be filed or otherwise asserted," and was required to pay all amounts due to anyone that might result in a mechanic's lien if unpaid.

The loan agreement provided that no modification would be valid if not in writing and signed by the party against whom modification was sought, and it contained an "Entire Agreement" clause.

Palace also executed a construction promissory note, with a loan maturity date of February 22, 2018. The promissory note provided that Palace would pay the costs of collecting or attempting to collect sums due

2

under the note and loan document, including reasonable attorney fees in the event of a default. It also provided for a higher rate of interest (the default rate) to be charged if Palace did not make any payments on time. Also among the loan documents was a deed of trust, which contained attorney fee and indemnity clauses that we discuss in further detail below.

## II. Project Delays and Request for Extension

The project was not finished by the scheduled completion date of December 1, 2017, and Bank extended the completion date to February 1, 2018 to allow Palace to continue to receive disbursements and finish the project, without defaulting on the loan.

On December 11, 2017, Marc Thompson, a senior vice president of Bank, wrote a letter to Palace's owner, Joel Campos, telling him that the construction loan would mature on February 22, 2018, and that Bank would need updated financial information in order to begin the credit process to extend the loan. Campos provided the requested documents, and Thompson told Campos he was working on the extension.

Campos received advice to seek replacement financing from other lenders, and there was evidence it would have been "very easy" for him to do so. Campos declined to do so, saying that he intended to continue to work with Bank.

It appears that subcontractors for the construction project were not being paid by February 2018, and the contractor, West Builders, Inc. (West Builders) informed Palace that it and the subcontractors would file liens on the project as of February 18.

Thompson did not have authority to approve a loan extension; rather, Bank's chief credit officer, Scott Givens, had final approval authority. Because of the uncertainty caused by the conflict between Campos and the

contractor, the six-month extension request was not submitted to Givens. Bank did not affirm an extension of the loan in writing before it matured on February 22, 2018.

## III. Further Negotiations and Mechanic's Liens

At a meeting with Thompson and other Bank representatives on March 1, 2018, Campos asked for the loan to be extended for six months, and for an increase in the loan amount. Bank told Campos it needed additional information about the cost to complete the project, the status of the tasks that remained, and additional items. Palace provided additional information, but Bank concluded the information was still incomplete.

Bank sent Palace and Campos a notice of default on March 1, 2018, stating that the construction note had matured and the outstanding balance was due, and that as a result "events of default" had occurred. The notice continued that, although Bank as willing to engage in discussions with Palace about "forbearance or other accommodation," Bank could terminate those discussions for any reason, except as provided in written agreements, and that Bank was not waiving its rights with respect to the maturity default or any other default. The notice of default did not list the outstanding balance on the loan.

West Builders sent Bank a stop-payment notice[1] on February 28, 2018, and filed a mechanic's lien on March 1, 2018 asserting it was owed more than $3,000,000 for work it had performed. Over the next three months, multiple subcontractors also filed liens. Palace's attorney wrote to the contractor on

---

[1] This was a legal notice to withhold construction funds equal to the value of labor and materials furnished but not paid for, pursuant to Civil Code sections 8520, 8530, and 9350.

4

March 8, 2018, telling it the loan could not be extended unless the lien was released.

Thompson sent an email to Palace on March 14, 2018, extending to March 20 the time for Palace to reach a settlement agreement with West Builders to clear the mechanic's liens and stop-payment notice, one of a number of conditions required before Bank could consider extending the loan maturity date.

Palace's attorney, Jonathan Rodriguez, sent an email to Bank's counsel on March 23, 2018, telling him Palace and West Builders had agreed to terms to "close out payments" and attaching a draft agreement for review and comment. The draft agreement included a number of blanks to be filled in, and it was not signed. Bank replied that its counsel would review the draft agreement and that Bank would then discuss an extension of the loan. It appears that Bank did not provide any further response regarding the draft agreement.

Despite the draft settlement agreement, it appears the disputes between Palace and West Builders continued. At a meeting on April 20 with representatives from Palace, West Builders, and Bank, there was a discussion about extending the loan and reaching a settlement between Palace and West Builders. Thompson testified it was clear that conflict between Palace and West Builders remained and that they had not reached an agreement to settle their differences.

Bank notified Palace on May 25, 2018, that the recording of the mechanic's liens was a breach of the loan agreement and that, as of June 12, 2018, it would exercise its rights to procure the release of the liens, with any amounts it expended deemed to constitute disbursement of the loan proceeds. But Bank and Palace continued to engage in discussions and negotiations,

5

during which Bank proposed the parties enter into a forbearance agreement but specified it was not making a binding commitment absent a signed agreement.

On May 29, 2018, before Bank and Palace came to terms on a forbearance agreement, West Builders filed an action against Palace and Bank, alleging causes of action including foreclosure of the mechanic's lien. Bank notified Palace on June 1, 2018 that in light of West Builders' action, it was withdrawing the forbearance proposal. On the same date, Bank wrote to Palace notifying it that it was invoking the default rate, and that interest would accrue at that higher rate.

Bank attempted unsuccessfully to negotiate with West Builders, and on June 28, 2018, Bank informed Palace that if there were no agreement by the following day, it would cease negotiations with West Builders and demand full repayment of the loan.

IV.    **Demand for Payment and Receiver Action**

Bank notified Palace on June 29, 2018 that it was in default, both because it failed to repay the loan by the maturity date and because it had not cured the mechanic's liens within 30 days of the May 25 notification. It demanded payment of all outstanding obligations, including unpaid principal, interest at the default rate, and attorney fees, costs, and expenses incurred by Bank as of July 6, 2018, and asked Palace to contact Bank before that date to obtain a payoff quote.

Palace (through Edward Schmitt, whom Campos had hired to arrange new financing) requested a payoff demand from Bank. On July 5, Schmitt informed Bank's counsel by email that Campos had been approved for financing on the project and would be able to pay Bank and take care of the liens, and that Palace was trying to close the deal by July 13. Because the

6

communication was "vague at best as to how the loans were going to be paid off" and lacked a commitment letter, Bank decided to continue to pursue its remedies under the loan documents. Bank's attorney forwarded the email to Palace's counsel, explaining that because Palace was represented by counsel he would not respond to Schmitt.

Bank's counsel emailed Palace's counsel on July 10, 2018, providing a loan payoff statement in the amount of $15,928,913.52, with daily interest of $4,722.13, but explaining that Bank was continuing to incur legal fees and that a final payoff quotation could not be provided until West Builders' action was dismissed with prejudice.

Bank filed an action against Palace on July 10, 2018, alleging a single cause of action for specific performance and appointment of a receiver to take possession of the property (the receiver action). Bank alleged that a number of events of default had occurred, among them that Palace did not pay all outstanding obligations on the February 22, 2018 maturity date and that Palace failed promptly to discharge or contest the mechanic's liens as required by the construction loan agreement. It also alleged Palace failed to satisfy its June 29, 2018 payment demand.

On July 12, 2018, Palace's counsel forwarded to Bank conditional offers that Palace had obtained from two lenders, and suggested it was unnecessary for Bank to seek appointment of a receiver. Because it appeared that Palace might soon be able to pay off the loan, Bank did not file a motion to appoint a receiver.

On July 24, 2018, Bank emailed a payoff demand to Palace's counsel in the amount of $16,376,974.09, including incurred legal fees of $341,370.54 and a $50,000 reserve for future legal fees and costs, and three days later sent a slightly amended demand.

7

Palace paid $16,402,084.74, the amount of the Bank's amended demand, on July 26, 2018. Bank refunded the $50,000 reserve legal fee on August 13, 2018. Campos testified he did not think the amount of legal fees Bank claimed was reasonable, but he paid it because he thought he would lose the building otherwise and felt he had no choice.

## V. The Current Action

Palace brought this action against Bank, alleging causes of action for breach of the construction loan agreement, breach of the covenant of good faith and fair dealing, economic duress, and negligence. The parties stipulated to have a referee hear and determine the entire case and prepare a statement of decision, upon which judgment would be entered, and the trial court so ordered. (Code Civ. Proc, § 638 et seq.; see *id.*, § 644, subd. (a).) After pretrial proceedings we need not detail here, the referee ultimately decided two causes of action, those for breach of the implied covenant of good faith and fair dealing and for economic duress.

The referee ruled against Palace on both causes of action. As to the cause of action for breach of the implied covenant of good faith and fair dealing, the referee found Bank had no contractual obligation to modify the loan agreement by extending the maturity date and therefore could not be held liable for failing to negotiate in good faith for an extension and that, in any case, the evidence did not show Bank acted unreasonably. The referee also rejected Palace's contention that Bank was estopped from relying on the lack of a written extension agreement, an argument made on the ground that Thompson assured Campos the extension would be granted but failed to submit the extension request for final approval before the maturity date. The referee found the evidence did not show Thompson made such an assurance

8

and that Palace knew Bank had not approved an extension before the maturity date.[2]

The referee also rejected Palace's contention that Bank breached the implied covenant by failing to review in a timely manner the draft settlement agreement between Palace and West Builders that Palace submitted in March 2018, on the ground that Bank had no contractual duty to review and comment on the submitted agreement and no implied duty to behave reasonably in reviewing it. And, the referee concluded, the Bank's failure to respond to the draft settlement agreement did not create an estoppel, as Bank did not agree to review the agreement within a specific time period; the agreement was not complete or final; Palace did not provide a final version or inquire as to the status of Bank's review; and Palace and West Builders had not, in fact, reached a final resolution of their dispute regarding the liens.

Palace was similarly unsuccessful with its claim that Bank breached the implied covenant when it demanded payment of the loan, interest, attorney fees, and costs on June 29, 2018, with less than one week's notice while refusing to provide the amount required to do so, and when it filed the receiver complaint. The referee explained that the loan agreement did not contain provisions governing the period to respond for a demand for payment or the content of the demand letter, and that the implied covenant did not impose a duty of "moderation" in enforcing Bank's rights. And when Palace's counsel requested the payoff amount on July 10, Bank's counsel provided the outstanding loan amounts, but explained that the amount of its attorney fees could not be determined while the West Builders action was still pending. Moreover, although Bank filed the receiver complaint, it did not file a motion

---

[2] Palace does not challenge on appeal the referee's findings regarding estoppel.

for appointment of a receiver. Under these circumstances, the referee concluded, Bank's failure to provide a final payoff amount was reasonable and did not breach the implied covenant.

As an independent ground for its ruling, the referee also concluded that Palace could not prove the cause of action for breach of the implied covenant because Palace itself breached the loan agreement by failing to pay the amounts due by the maturity date of February 22, 2018.

As to Palace's claim for economic duress, the referee concluded the evidence did not show Bank acted wrongfully either in bringing the receiver action or in requiring Palace to pay its attorney fees. Nor did it show Palace had no reasonable alternative to paying the attorney fees, for instance by raising objections with Bank or commencing litigation.

Judgment was entered in favor of Bank and against Palace. Bank then moved for an award of attorney fees. The referee granted the motion, ruling Bank was entitled to attorney fees and costs of $3,014,035.10. Palace appealed both from the judgment and from the award of attorney fees and costs, and we consolidated the appeals.

## DISCUSSION

### I. Implied Covenant of Good Faith and Fair Dealing

*A. Palace's Contentions*

Palace contends the referee erred in ruling that Bank owed no duty of good faith and fair dealing in the absence of a new agreement between the parties. To the extent the referee's determination rests of factual determinations, our review is for substantial evidence, upholding the decision below if there is any substantial evidence, contradicted or uncontradicted, to support the judgment, and resolving all conflicts in favor of the judgment. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.) To the extent

10

the issue is one of law, we review it de novo. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432.)

In the second cause of action, Palace alleged it attempted to negotiate a forbearance with Bank to secure additional loan disbursements and arrange financing to complete the construction project. As a result of Bank's failure to make what Palace alleged were required disbursements, mechanic's liens were recorded against the property. And, Palace alleged, rather than negotiating in good faith, Bank took the opportunity to generate substantial fees and charges at Palace's expense and to place Palace in economic duress so Bank could take control of the property and sell it for a profit. Bank also acted in bad faith in failing to agree to new financing or to submit a payoff demand so the loan could be retired. As a result of Bank's actions in violation of the implied contractual covenant of good faith and fair dealing, Palace alleged, Palace had no choice but to pay Bank's "exorbitant and outrageous fees and charges" in order to pay off the loan.

Palace contends the referee made an error of law, subject to our de novo review, in finding Bank did not violate the implied covenant of good faith and fair dealing. Specifically, Palace argues Bank had an obligation not to deprive it of the opportunity to resolve the mechanic's liens with West Builders (by reviewing and commenting on the draft settlement agreement) as well as an obligation to present Palace with the sum that was "due and payable" to pay off the construction loan.

*B. Events of Default*

Before deciding the extent of any implied covenant of good faith and faith dealing, we must consider Palace's contention that it did not default on its obligations under the loan agreement. The referee concluded Palace was

11

in default as a result of its failure to pay the outstanding amounts by the maturity date.

Two defined "Events of Default" under Paragraph 19.1 of the loan agreement are pertinent here. The first is the "[f]ailure of Borrower to make any principal, interest, or other payment when due and payable." (Paragraph 19.1(a).) The second is the "[f]ailure of Borrower to observe or perform any of the other non-monetary covenants or conditions by Borrower to be performed under the terms of this Agreement or any other Loan Document for a period of thirty (30) days after written notice from Lender, provided that if any such failure concerning a non-monetary covenant or condition is susceptible to cure and cannot reasonably be cured within said thirty (30) day period, then Borrower shall have an additional sixty (60) day period to cure such failure and no Event of Default shall be deemed to exist hereunder so long as Borrower commences such cure within the initial thirty (30) day period and diligently and in good faith pursues such cure to completion within such resulting ninety (90) day period from the date of Lender's notice." (Paragraph 19.1(b).)

Palace leans heavily on Paragraph 19.1(a)'s requirement that default occurs when amounts are not paid when "due and payable," arguing that Bank delayed providing a payoff quote while attorney fees were accumulating and that until Bank informed it, in late July 2018, of the total amount due, including attorney fees and costs, no amount was both due *and payable*. Palace contends that until Bank presented a quote, it had no obligation to pay. And, Palace argues, it did not exceed the time authorized under paragraph 19.1(b) of the loan agreement in its efforts to remove the mechanic's liens. Thus, according to Palace, there were no "events of default."

12

Two problems with this argument are found in the terms of the construction loan agreement and promissory note. First, paragraph 4.3 of the loan agreement provides that "[a]ll principal, interest and other sums due under the Loan Documents shall be *due and payable in full on the Maturity Date*," or February 22, 2018. (Italics added.) It is undisputed that Palace did not pay those amounts by that date, and Palace makes no showing that it could not ascertain how much was due at that point, before Bank began incurring attorney fees. To the extent Palace needed the Bank to calculate what it owed, it could have asked for a payoff number in February 2018—or in March, immediately after receiving notice from Bank of the events constituting default—instead of waiting until early July to make this request. Second, paragraph 8 of the promissory note provides that Palace "hereby waives presentment for payment [and] demand." Palace contends that this language waives only a requirement that Bank present the original instrument as a condition for payment, but the only California law to which Palace cites gives a broader reading to the term: " 'Presentment' means a demand [to pay] made by or on behalf of a person entitled to enforce an instrument." (See Cal. U. Com. Code, § 3501, subd. (a).) Thus, under the express terms of the loan agreement and the promissory note, Palace's argument that no amounts were "due and payable"—and thus, no default occurred—until Bank presented a payoff quote fails.

We thus conclude the evidence supports the referee's finding that an event of default occurred under Paragraph 19.1(a) when Palace did not repay the note on the maturity date.

As to Paragraph 19.1(b)'s provision that Palace would have 30 days after written notice to cure a failure to perform a non-monetary covenant, to be extended by 60 days if Palace diligently began a cure during that period,

13

Palace contends it was entitled to the benefit of the additional 60 days to cure the mechanic's liens before being considered in default.[3] It points out that Bank sent an email on March 14, 2018 telling Campos he must enter into a settlement agreement with West Builders to clear the mechanic's liens by March 20, 2018. According to Palace, it then began diligent efforts to clear the liens by coming to a draft settlement agreement and sending it to Bank for review. But even assuming paragraph 19.1(b) gave Palace 90 days from the March 14 email to cure the liens—or until June 12—Palace did not do so within that 90-day period. Palace suggests, apparently in the alternative, that the period to cure the liens began only in June 2018, when Bank "abruptly cut[ ]off its negotiations with West Builders," but it does not show that it was not in default as a result of its continuing failure to cure the liens after receiving notice on March 14. Thus, Palace has not shown that the evidence compels a conclusion that it did not default under Paragraph 19.1(b) of the loan agreement.

This conclusion—that substantial evidence supports the referee's findings that Palace defaulted on its obligations—will prove dispositive of Palace's claims on appeal.

*C. Scope of Duty of Good Faith and Fair Dealing*

Every contract carries an implied covenant of good faith and fair dealing, which "prevents one side from unfairly frustrating the other's right to receive the benefits of the agreement actually made. . . . A plaintiff claiming breach must allege the defendant's wrongful conduct was contrary to the contract's purpose and the parties' legitimate expectations." (*Cordoba*

---

[3] The referee made no finding on this issue, presumably because—as Bank argues and Palace does not dispute—Palace did not argue below that it was entitled to 90 days to cure the mechanic's liens.

*Corp. v. City of Industry* (2023) 87 Cal.App.5th 145, 156.) The covenant is not
" ' "endowed with an existence independent of its contractual
underpinnings," ' " and "cannot impose substantive duties or limits on the
contracting parties beyond those incorporated into the specific terms of the
agreement." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 349–350;
accord, *Avidity Partners, LLC v. State of California* (2013) 221 Cal.App.4th
1180, 1204.) While breach of a specific provision of a contract is not
necessary, "[i]t is universally recognized the scope of conduct prohibited by
the covenant of good faith is circumscribed by the purposes and express terms
of the contract." (*Carma Developers (Cal.), Inc. v. Marathon Development
California, Inc.* (1992) 2 Cal.4th 342, 373.) If an act is authorized by the
express terms of a contract, " 'no covenant of good faith and fair dealing can
be implied which forbids such acts and conduct.' " (*Id*. at p. 374.)

The law is clear that, absent special circumstances, the duty of good
faith and fair dealing does not require a party either to behave reasonably in
negotiations to amend an existing contract or to be moderate in exercising its
rights in the event of default. *Racine & Laramie, Ltd. v. Department of Parks
& Recreation* (1992) 11 Cal.App.4th 1026 is illustrative. A concessionaire had
a contract with the California Department of Parks and Recreation to operate
at a state historic park under a contract that contemplated that the parties
might negotiate modifications. (*Id*. at pp. 1028, 1030–1031.) The parties
negotiated for several years to modify the contract to allow expanded
operations at the premises, but the negotiations broke down, and the
concessionaire brought an action against the department for breach of the
implied covenant of good faith and fair dealing. (*Id*. at p. 1028.) A jury found
for the concessionaire, and the appellate court reversed the judgment. (*Id*. at
pp. 1028–1029.) Because the Department had no obligation to negotiate new

15

terms for the concession contract, the court ruled, "its assumption of an arbitrary stance at some point in the negotiations cannot therefore be a breach of any contract term, including implied contract terms of good faith and fair dealing, even though such conduct might be found by a jury to be unreasonable, unfair, or otherwise bad faith negotiation tactics." (*Id*. at p. 1031.) Nor had the Department made an agreement to negotiate in good faith, and the facts did not give rise to an estoppel. (*Id*. at pp. 1033–1034.) Finally, there was no indication the Department had exercised discretionary powers with respect to the modification arbitrarily or in disregard of the purposes of the contract or the concessionaire's interests. (*Id*. at p. 1034.) Absent such special circumstances or conditions, "there is no obligation in California to bargain for a new or amended contract in good faith." (*Id*. at p. 1035.)

*Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465 (overruled on another ground in *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn*. (2013) 55 Cal.4th 1169, 1179, 1182) articulated a related principle. The plaintiffs in *Price* obtained loans from a bank but fell behind on the payments. (*Id*. at pp. 471–473.) The bank agreed to forbear publishing notice of a trustee's sale if, inter alia, the plaintiffs paid all outstanding amounts by a certain date, on which the plaintiffs made only partial payment. The bank published a notice of trustee's sale, and the plaintiffs finally paid the full amount of the loans. (*Id*. at pp. 473–474.) The plaintiffs then sued the bank, alleging as damages that they were forced to sell assets at distressed prices to make the final payments. (*Id*. at p. 474.) The trial court granted summary judgment, and the Court of Appeal affirmed, rejecting the plaintiffs' argument that the bank breached the implied covenant of good faith and fair dealing by taking a " 'hard line' " in

16

negotiations on the ground that the covenant "does not impose any affirmative duty of moderation in the enforcement of legal rights." (*Id*. at p. 479; accord, *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.* (2002) 100 Cal.App.4th 44, 56, fn. 10.) It also noted that the plaintiffs had not raised the equitable defense of estoppel, which may act to bar unfair tactics in the enforcement of agreements. (*Price*, at p. 479.)

Applying these principles, the referee did not err in concluding Bank did not violate the implied covenant of good faith and fair dealing. There is evidence Palace was in default as of February 22, 2018, the loan's maturity date. When notifying Palace of the default on March 1, 2018, Bank stated it would engage in discussions of forbearance only on condition it could terminate negotiations for any reason, and it reserved its rights under the default. The parties never agreed to a modification of their contract, and under *Racine* and *Price*, Bank was not obligated to behave reasonably in its negotiations or in enforcing its rights after the default.

Against this conclusion, Palace argues that Bank acted unreasonably in failing to respond to its draft agreement with West Builders. But, as the referee pointed out, Bank did not have a contractual duty to review and comment on the document. And regardless of whether Bank commented on the draft agreement, the record shows (and the referee found) the conflict between Palace and West Builders had not actually been resolved, as shown by the April 20, 2018 meeting at which Palace, West Builders, and Bank discussed the settlement and it became clear that Palace and West Builders had not reached an agreement.

Palace also argues that Bank put it in an impossible bind by demanding payment in June 2018 but failing to provide an immediate payoff quote. The referee found Bank's behavior "entirely reasonable under the

17

circumstances," when Palace had not yet obtained the new financing necessary to pay off the construction loan and Bank was continuing to incur attorney fees. Substantial evidence supports this finding.

In any event, there is another basis for the referee's decision that Palace does not show was erroneous. The referee concluded that Palace was in default as of February 22, 2018, and as we have discussed, the record supports that conclusion. In its March 1, 2018 default notice, Bank explained it was willing to discuss accommodations but that it was not waiving the default, and that it would not be bound by those discussions unless set forth in written agreements. Palace did not claim otherwise in response to Bank's default notice, and indeed, Campos appears to have acknowledged the "default status" of the loan in a March 13, 2018 email to West Builders, which he forwarded to Thompson.

Citing *Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1388, the referee concluded that this default prevented Palace from proving its own " 'performance or excuse for nonperformance,' " a prerequisite to a cause of action for breach of the implied covenant of good faith and fair dealing. This was an independent basis for the referee's conclusion that Bank did not violate the implied covenant in failing to review and respond to the draft settlement agreement or state a payoff amount. Palace makes no effort to show the referee erred in concluding it must prove its own performance or excuse for nonperformance to assert a violation of the implied covenant of good faith and fair dealing (see *Merced Irrigation Dist. v. County of Mariposa* (E.D. Cal. 2013) 941 F.Supp.2d 1237, 1280 [among elements of California cause of action for breach of implied covenant, plaintiff must have substantively performed under contract or been excused]), instead arguing only that it was not in default. It has thus forfeited any challenge to

18

this basis for the referee's ruling. (See *Children's Hospital & Medical Center v. Bontá* (2002) 97 Cal.App.4th 740, 777 [we do not consider issues not raised in appellant's briefs]; *Haight Ashbury Free Clinics, Inc. v. Happening House Ventures* (2010) 184 Cal.App.4th 1539, 1554, fn. 9 [same].)

## II. Economic Duress

In its cause of action for economic duress, Palace alleged that during February and March 2018, the parties operated with the understanding that the loan agreement was in effect and there had been no events of default; that, without Palace's knowledge, Bank was simultaneously preparing to appoint a receiver and market the building; that in May 2018, Bank indicated it was willing to enter into a forbearance agreement, but that it proposed unreasonable terms; that contractors sued Palace as a result of Bank's failure to come to a reasonable agreement, putting the project in jeopardy; that the lawsuits by the contractors seeking to foreclose on the property meant Palace had to either submit to foreclosure or obtain a new loan; that in early July 2018, Bank rejected Palace's offer to pay off the loan unless Palace agreed to its unreasonable economic demands, including paying over $341,000 in attorney fees, plus an additional $50,000 for future legal fees; that Bank filed the receiver action so it could take possession of the property and market it; and that under the circumstances, Palace had no reasonable alternative but to pay the amount Bank demanded.

The referee rejected this cause of action. First, he concluded, the Bank's action in filing the receiver action did not support a claim of economic duress: the complaint in that action correctly alleged events of default occurred when Palace failed to pay its outstanding obligation on the maturity date, when it failed to satisfy the demand for payment, and when it failed to resolve the mechanic's liens. Nor did the demand for attorney fees create

economic duress. The loan agreement provided that Palace would pay Bank's reasonable attorney fees in the event of default and, the referee found, the evidence established that the claimed fees were reasonable. In any case, the referee reasoned, even if Palace had established a wrongful act, it was not placed in a position in which it had no alternative but to submit to Bank's allegedly unreasonable and coercive demands for payment of attorney fees, as Palace could have raised its concerns and objections about specific fees sought by Bank, and it could have sued Bank. Nor did the record show Palace had to pay the fees to avoid losing the building; no notice of default had been recorded, and Bank did not schedule a hearing to appoint a receiver.

The economic duress doctrine, based on equity, comes into play "upon the doing of a wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure. [Citations.] The assertion of a claim known to be false or a bad faith threat to breach a contract or to withhold a payment may constitute a wrongful act for purposes of the economic duress doctrine. [Citations.] Further, a reasonably prudent person subject to such an act may have no reasonable alternative but to succumb when the only other alternative is bankruptcy or financial ruin." (*Rich & Whillock, Inc. v. Ashton Development, Inc.* (1984) 157 Cal.App.3d 1154, 1158–1159.) The purpose of the doctrine is not to prevent "[h]ard bargaining, 'efficient' breaches [of contract] and reasonable settlements of good faith disputes," but to prevent "the wrongful exploitation of business exigencies to obtain disproportionate exchanges of value," serving as "a last resort to correct these aberrations when conventional alternatives and remedies are unavailing." (*Id.* at p. 1159; accord, *Hester v. Public Storage* (2020) 49 Cal.App.5th 668, 679.) The inquiry of whether a party asserting economic duress had a reasonable

alternative is one of fact. (*CrossTalk Productions*, *Inc. v. Jacobson* (1998) 65 Cal.App.4th 631, 644.) We review factual determinations for substantial evidence. (See *Howard v. Owens Corning*, *supra*, 72 Cal.App.4th at p. 631.)

Substantial evidence supports the referee's findings. Palace argues the predicate of the demand for attorney fees fails because there was no event of default that would justify Bank incurring those fees. But, as we have already explained, there is evidence that an "event of default" occurred when Palace failed to pay off the loan by the maturity date, and there is also evidence supporting the finding that Palace failed to resolve the mechanic's liens in a timely manner.

Nor are we persuaded by Palace's contention that the claimed fees' unreasonableness is demonstrated by the fact that the legal bills were redacted to protect materials covered by the attorney-client privilege or the work product doctrine. The records were indeed redacted, but our review indicates the redactions are primarily of descriptions of the topics of communications between Bank and its counsel and of legal analysis carried out by counsel. Palace provides no authority suggesting such redactions are inappropriate or calling into question the reasonableness of the attorney fees charged here. Rather, it relies on an inapposite case in which "blocked-billing entries render[ed] it virtually impossible to break down hours on a task-by-task basis" between those attributable to a cause of action for which an award of attorney fees was available and those for which fees were unavailable. (*Bell v. Vista Unified School Dist.* (2000) 82 Cal.App.4th 672, 689.) Here, on the other hand, there is no question of apportionment of fees, and the bills are detailed. Bank's expert witness on attorney fees described the billing statements as "meticulous and . . . intelligible to anyone who was reviewing them." He also opined that, based on his experience with many

21

similar matters, the fees were reasonable, that they were "not only what I expected to see, but I would not have been surprised had the fees been higher," and that Bank and its counsel approached the situation in a "very measured and thoughtful way," for instance by not recording a notice of default or a complaint for appointment of a receiver early on.

Palace points out that the expert could not state with absolute certainty that any individual redacted entry was reasonable or how much time counsel spent working on any given document. But Palace does not show such a level of certainty is necessary to support a finding that fees were reasonable, and in fact, courts routinely accept billing statements that have been redacted to protect the attorney-client privilege. (See, e.g., *Banning v. Newdow* (2004) 119 Cal.App.4th 438, 454 [redactions in bills did not render party "unable to challenge the reasonableness of the fees"]; accord, *People v. Kelly* (2020) 59 Cal.App.5th 1172, 1186; see also *Concepcion v. Amscan Holdings, Inc.* (2014) 223 Cal.App.4th 1309, 1325 [class counsel must prove reasonable number of hours spent on litigation, "whether through declarations or redacted or unredacted timesheets or billing records"].)

As an independent basis for rejecting the economic duress cause of action, the referee found Palace had not established that it had no reasonable alternative to paying the attorney fees and reserves. Substantial evidence supports this finding as well. Although Bank filed the receiver action, it did not schedule a hearing to appoint a receiver once it received confirmation Palace was arranging new financing. Because the receiver action never progressed beyond the pleadings stage, we need not resolve Palace's contention that Bank's complaint contained material misrepresentations; even if true, this would not prove economic duress. Also, Bank's expert testified that a borrower who believed that claimed attorney fees were

excessive would normally raise the issue and try to negotiate a reduction, and there is no evidence Palace ever did so. In fact, when Bank's counsel sent the fee statements to Palace's counsel on July 20 and 23, 2018, he asked Palace to let him know if it had any questions about the amounts owed so the parties could try to resolve them, and he again invited Palace to raise any issues when he sent the payoff demand on July 24, 2018.

In short, Palace has not undermined the referee's finding that Bank's actions did not compel Palace to pay unreasonable sums to retire the loan.

## III. Attorney Fees

### A. Background and General Legal Principles

After the referee ruled in Bank's favor, Bank moved for contractual attorney fees and costs as the prevailing party, contending that fees were available under several provisions of the documents executed in connection with the project, including the construction promissory note, the loan agreement, and the deed of trust. The referee found that reasonable attorney fees and costs were independently available under two sections of the deed of trust, sections 7.5 and 7.7. He set reasonable attorney fees at $2,856,956.82 and, after granting Palace's motion to tax costs, set reasonable costs at $38,184.54.

Each party to a lawsuit must pay its own attorney fees except where a statute or contract provides otherwise. (*Cargill, Inc. v. Souza* (2011) 201 Cal.App.4th 962, 966.) Where a contract specifically provides for an award of attorney fees incurred to enforce that contract, the prevailing party is entitled to reasonable fees. (*Ibid.*; Civ. Code, § 1717, subd. (a).) Unless interpretation of a contract turns on extrinsic evidence, we review de novo the determination of the legal basis for an award of attorney fees, giving no deference to the trial court's ruling. (*Yoon v. CAM IX Trust* (2021) 60

Cal.App.5th 388, 391; *Alki Partners, LP v. DB Fund Services, LLC* (2016) 4 Cal.App.5th 574, 599 (*Alki Partners*).)

*B. Section 7.7 of Deed of Trust*

Section 7.7 of the deed of trust provides in pertinent part: "Indemnification. Borrower will protect, indemnify and save harmless Lender from and against any and all liabilities, obligations, claims, damages, penalties, assessments, fines, causes of action and actual expenses (including, without limitation, attorneys' disbursements, charges and reasonable fees) imposed upon or incurred by or asserted against Lender or the Property or any of Lender's interest therein, by reason of the execution of this Deed of Trust, the Note or any other Loan Documents, or the consummation of the transactions contemplated hereby or thereby, or the occurrence or existence during or prior to the term of this Deed of Trust of any of the following: (a) . . . (e) any failure by Borrower to perform its obligations under this Deed of Trust, the Note, the Loan Agreement, the Assignment of Leases, or any other Loan Document. . . . Borrower agrees that its obligations under this Section shall include indemnifying Lender for all attorney's charges, disbursements and fees, and all other actual expenses incurred by Lender to enforce the terms of this Section. . . . *If any action or proceeding shall be commenced* (including, without limitation, an action to foreclose this Deed of Trust, collect the indebtedness secured hereby or to enforce Lender's rights under the Assignment of Leases or any other Loan Document) *by Lender or Borrower or any third party, to which action or proceeding Lender is made a party by reason of the execution of this Deed of Trust, the Note, the Loan Agreement, the Assignment of Leases, or any other Loan Document in which it becomes necessary to enforce, defend or uphold the lien of this Deed of Trust or Lender's rights under the Note, all actual expenses incurred by Lender in*

24

*connection with any litigation to enforce, prosecute or defend the rights and lien created hereby or otherwise incurred in connection with any other action or proceeding referred to in this Section (including, without limitation, attorneys' charges, disbursements and reasonable fees) shall be paid by Borrower to Lender within ten (10) days after Lender's demand for payment. . . .* The obligations of Borrower under this Section shall survive repayment of the Secured Obligations and the satisfaction of this Deed of Trust." (Italics added.)

The referee concluded that the reasonable meaning of the italicized portion of section 7.7, as the parties would have understood it, is that Bank was entitled to attorney fees if it had to enforce the loan documents. That is, according to the referee, section 7.7 was not simply an indemnity provision, but "separately provides for the recovery of attorney fees and costs incurred by Bank in enforcing its rights under the Loan Documents," as Bank did when defending against Palace's claims for breach of contract, breach of the implied covenant, and economic duress. Thus, according to the referee, attorney fees and costs were available under section 7.7. Palace contends this ruling was error.

Indemnity is "an obligation of one party to pay or satisfy the loss or damage incurred by another party," which may cover claims between the contracting parties themselves or claims by third parties. (*Rideau v. Stewart Title of California, Inc.* (2015) 235 Cal.App.4th 1286, 1294.) "Generally, the inclusion of attorney fees as an item of loss in a third-party claim-indemnity provision does not constitute a provision for the award of attorney fees in an action on the contract which is required to trigger section 1717." (*Carr Business Enterprises, Inc. v. City of Chowchilla* (2008) 166 Cal.App.4th 14, 20 (*Carr*).)

The court in *Alki Partners* explained that in general, an indemnification provision "allows one party to recover costs incurred defending actions by third parties, not attorney fees incurred in an action between the parties to the contract." (*Alki Partners*, *supra*, 4 Cal.App.5th at p. 600.) To distinguish the two types of provisions, courts look to several indicators, including an express reference to indemnification, such as the words " 'indemnify' and 'hold harmless,' " which indicate the clause applies to damages the indemnitee must pay to third persons. (*Ibid*.) And courts examine the context of the language: "[g]enerally, if the surrounding provisions describe third party liability, the clause will be construed as a standard third party indemnification provision." (*Ibid*., citing *Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 970.) Thus, the court in *Alki Partners* concluded contractual language stating one party would " 'indemnify' " the other for all losses, including attorney fees, " 'resulting in any way from the performance or non-performance of [the indemnitor's] duties hereunder' " did not authorize recovery of attorney fees in actions seeking to enforce the contract itself. (*Alki Partners*, at p. 602.)

Similarly, the court in *Carr* concluded a provision requiring a contractor to " 'indemnify and hold harmless' " a city from " 'all claims, damages, losses and expenses including attorney fees arising out of the performance of the work described herein,' " caused by the negligent act or omission of the contractor, was a standard indemnity provision that did not extend to disputes arising out of the contract. (*Carr*, *supra*, 166 Cal.App.4th at pp. 19–23, italics omitted.) It distinguished the provision from that in *Baldwin Builders v. Coast Plastering Corp.* (2005) 125 Cal.App.4th 1339, 1344–1345, which included not only standard third-party indemnity language but also required the indemnitor to pay " 'all costs, including attorney's fees,

26

incurred in enforcing this indemnity agreement.' " (Italics omitted.) Because this portion of the provision in *Baldwin* "unambiguously contemplate[d] an action *between the parties* to enforce the indemnity agreements," it was an attorney fee clause subject to Civil Code section 1717's reciprocity requirements, a conclusion not altered by the placement of the attorney fee clause in the indemnity agreement. (*Baldwin Builders*, at pp. 1345–1346; see *Carr*, at pp. 22–23.) *Carr* and *Baldwin Builders* both relied for this point on *Continental Heller Corp. v. Amtech Mechanical Services, Inc.* (1997) 53 Cal.App.4th 500, which concluded a provision obligating a subcontractor to " 'indemnify the Contractor, and save it harmless from any and all loss, damage, costs, expenses and attorney's fees suffered or incurred *on account of any breach of the aforesaid obligations and covenants, and any other provision or covenant of this Subcontract*,' " entitled the prevailing party to attorney fees in any action for breach of any provision of the contract. (*Id.* at p. 508; *Carr*, at p. 23; *Baldwin Builders*, at p. 1345.)

Section 7.7 of the deed of trust likewise expressly contemplates actions between the parties. It covers not only third-party claims but also actions "commenced . . . by Lender or Borrower," including those to foreclose the deed of trust, collect the secured indebtedness, or enforce Bank's rights under any loan document. Although this provision is found within an indemnity clause, it unambiguously covers attorney fees in actions between the parties to enforce or defend Bank's contractual rights.

But, Palace argues, the provision does not extend to *this* action because the relevant portion section 7.7 applies to actions in which it "becomes necessary to enforce, defend or uphold the lien of this Deed of Trust or Lender's rights under the Note," and Bank was not enforcing or defending its rights under the promissory note. That is because, according to Palace, it

27

paid the promissory note in full on July 26, 2018 and Bank reconveyed the deed of trust, so there was nothing left to enforce, defend, or uphold in connection with the promissory note, and the case turned on the terms of the loan agreement, not the deed of trust or the promissory note.

We are unpersuaded. The promissory note recites that it was issued pursuant to the loan agreement and that payment was governed by the loan agreement, the terms of which it incorporated by reference; it provides that the full loan amount is due on the maturity date; and it specifies the default interest rate. The second amended complaint alleged that Palace executed the promissory note with a maturity date of February 22, 2018, incorporated the promissory note by reference, and sought compensation for Bank's actions in failing to continue disbursements after the maturity date passed and in failing to enter into a forbearance agreement on reasonable terms. Palace's second amended complaint thus called on Bank to defend its rights under the promissory note. Also, section 7.7 of the deed of trust expressly provides that Palace's obligation "shall survive repayment of the Secured Obligations and the satisfaction of this Deed of Trust." That Palace had paid the promissory note in full before filing this action is therefore immaterial. We are satisfied that the attorney fees Bank incurred in defending this action fall within the ambit of section 7.7.

Palace contends that even if section 7.7 applies to this action, it does not authorize an award of attorney fees to the prevailing party, but merely allows the amount of the fees to be added to the secured debt. Palace relies first on *Hart v. Clear Recon Corp.* (2018) 27 Cal.App.5th 322. In that case, a lender sought attorney fees under a contractual provision that the lender could take certain actions, including appearing in court and paying reasonable attorney fees to protect its interests, and that "[a]ny amounts

28

disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument," which would bear interest and be payable upon notice. (*Id*. at p. 325, italics omitted.) This provision, the *Hart* court concluded, was not an attorney fee provision for purposes of Civil Code section 1717, which applies when a " 'contract specifically provides that attorney's fees . . . shall be awarded' to one party or the prevailing party." (*Hart*, at p. 327.) The language in question did not meet that standard; rather than a provision for an award of attorney fees, "it is, instead, a provision that attorney's fees, like any other expenses the lender may incur to protect its interest, will be added to the secured debt." (*Ibid*.)

The court in *Chacker v. JPMorgan Chase Bank, N.A.* (2018) 27 Cal.App.5th 351, examined an identical provision and likewise concluded it did not authorize the court "to enter an attorney fee award order that obligates the borrower to pay fees independent of the borrower's repayment obligation under the deed of trust and associated promissory note." (*Id*. at pp. 356 & 358, fn. 6.) Rather, it "authorizes attorney fees to be added to the loan amount." (*Id*. at p. 357.)

Palace argues the rule of *Hart* and *Chacker* applies equally here. We disagree. First, unlike the provisions at issue in those cases, section 7.7 of the deed of trust does not provide for attorney fees to be added to the loan amount, but merely that they will be paid within 10 days of Bank's demand. Palace argues that this gap is filled by section 7.6 of the construction loan agreement, headed "Single Loan," which provides: "All of the obligations of Borrower arising under this Agreement and the other Loan Documents shall constitute one obligation of Borrower and shall be secured by the Project." But section 7.7 of the deed of trust, which we have concluded authorizes attorney fees here, specifies that Palace's obligations under that provision

29

"shall survive repayment of the Secured Obligations and the satisfaction of the Deed of Trust." We are not persuaded that the general "Single Loan" provision prevents Bank from seeking its attorney fees by motion, particularly where, as here, the loan has been paid off and the deed of trust satisfied. The referee properly awarded attorney fees and costs.

Because we reach this conclusion, we need not address the referee's conclusion that section 7.5 of the deed of trust provides an independent basis for an award of attorney fees and costs.

Bank is also entitled to recover its reasonable attorney fees on appeal, the amount of which is best determined by the trial court. (See *Shadoan v. World Savings & Loan Assn.* (1990) 219 Cal.App.3d 97, 109; *Beverly Hills Nat. Bank v. Glynn* (1968) 267 Cal.App.2d 859, 870.)

## DISPOSITION

The judgment and attorney fee order are affirmed. Bank shall recover its costs on appeal. The matter is remanded for a determination of the fees that should be awarded to Bank on appeal.

TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
PETROU, J.

*The Palace at Washington Square, LLC v. Mechanics Bank* (A164195, A164799)